## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

**CIVIL ACTION NO. 1:13-CV-00124-JHM**

**CAREY WOODCOCK, as Administratrix**
 **of the Estate of GREGORY HARRISON,**
 **deceased**                                                                                             **PLAINTIFF**

**V.**

**CITY OF BOWLING GREEN, KENTUCKY;**
**DOUG HAWKINS, individually;**
**KEVIN WILES, individually;**
**MELANIE WATTS, individually;**
**DONITAKA KAY, individually; and**
**KEITH CASADA, individually**                                                          **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This action arises from the tragic shooting of Gregory Harrison by Bowling Green Police Officer Keith Casada. The Court has great respect and admiration for the Bowling Green Police Department and law enforcement generally. It is a difficult and dangerous job we ask them to do and most times, they do it exceedingly well. In this case, there is nothing sinister or evil about Officer Casada. He simply used more force than was reasonable at the time he decided to use force. Case law justifies the use of deadly force when a suspect poses an imminent threat of serious physical harm to officers or others. Most cases justifying the use of deadly force involve rapidly occurring events requiring split second, on the spot, or instantaneous decision-making based on the threatening advances of a suspect. The situation faced that night by the Bowling Green Police Department officers, while tense and potentially dangerous, had not yet reached the point where the use of deadly force was reasonable. Officer Casada simply acted too soon.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on the liability of Defendants Keith Casada and Donitka Kay [DN 60] and on Defendants' Motion

for Summary Judgment [DN 61] and Motion for leave to file the sur-reply tendered by Defendants in opposition to Plaintiff's Reply in Support of Plaintiff's Motion for Partial Summary Judgment against Defendants Donitka Kay and Keith Casada [DN 72].  The Court heard oral argument on the motions on November 23, 2015.  Fully briefed and argued, this matter is ripe for decision.  For the following reasons, Plaintiff's Motion for Partial Summary Judgment [DN 60] is **GRANTED in part** and **DENIED in part** and Defendants' Motion for Summary Judgment [DN 61] is **GRANTED in part** and **DENIED in part**.  Defendants' Motion for Leave to file a Sur-Reply [DN 72] is **GRANTED** and the Court considered Defendants' Sur-Reply in addressing this matter.

## I.   BACKGROUND

This case arises from the fatal shooting of Gregory Harrison by Keith Casada, then an officer of the Bowling Green Police Department, at approximately 2:00 AM on August 12, 2012.

At approximately 1:26 AM, an unidentified caller placed the first of two phone calls from his cell phone to the Bowling Green Police Department ("BGPD").  (Piper Dep. [DN 45-1] 29:2–:19, Mar. 3, 2015.)  The first call, which was made to one of BGPD's administrative lines, not 9-1-1, was received by telecommunication officer Danielle Piper.  The caller, later identified as Harrison, stated "Yes, I'm on my way to Louisville Bridge, I wanna beat the hell out of my brother, and if they want me, KILL me," before disconnecting.  (Audio of first phone call, Piper Dep. Ex. 1 [DN 46-1] recorded on 12-Aug-2012 at 01.25.58 AM.)  Piper entered CAD (computer aided-dispatch) notes into the BGPD system of the "nature and description of what happened during that phone call."  (Piper Dep. [DN 45-1] 13:6–:8; see Piper Dep. Exs. 2–3 [DN 45-1] CAD Report, Aug. 12, 2012.)

Based on Piper's CAD notes, police dispatcher Christy Montgomery dispatched Officer Keith Casada on the call as the primary officer, and Officers Jordan Wilson and Michael Amos,

as back-up officers, to try to locate the caller to see what was going on.  (Piper Dep. Exs. 1–3 [DN 45-1]; <u>see</u> Piper Dep. [DN 45-1] 14:17–:24, 21:1–:5, 23:15–24:1.)  Montgomery advised of possible "unknown trouble" at Louisville Road bridge at East Riverview Drive and that they had a landline call in, male subject, "advised that he was at the Louisville Road bridge and that he wanted to assault his brother and then disconnected."  (Audio of Police Radio, Piper Dep. Ex. 1 [DN 46-1] recorded on 12-Aug-2012 at 01.27.25 AM.)  The officers responded to the Louisville Road area but were unsuccessful in locating the caller.  (Wilson Dep. [DN 43-1] 11:12–12:14, 13:1–:5.)  Piper called the number back to try to verify the caller's location, but the phone's voicemail picked up.  (Audio of return call, Piper Dep. Ex. 1 [DN 46-1] recorded on 12-Aug-2012 at 01.31.06 AM.)  From the recorded voicemail greeting, she learned that the cell phone owner's first name was Greg.  (<u>Id.</u>)

At 1:37 AM, Harrison, who was not yet identified, placed a second call to BGPD, using 9-1-1, instead of one of BGPD's administrative lines.  (<u>See</u> Audio of second call, Hanes Dep. Ex. 1 [DN 48] recorded on 12-Aug-2012 at 01.37.19.)  In the second call, Harrison spoke with telecommunication officer Holly Hanes:

> [Harrison]: "Uh, yes, my emergency [slurred] I'm at the T-Mart, I'm'a kill my family, I've asked for help and I've asked for help, [Hanes: "where are you?"] and they have ignored me.  No, no, they have ignored me.  You know what?  You'll have ignored me."
>
> [Hanes]: "We sent someone to where you said you were, where are you right now?"
>
> [Harrison]: "You know what?  I'm gon' kill my brother, I don't give a fuck, my mother-in-law's had a stroke.  You know what, I'm down in the parking lot with a gun, by my"
>
> [Hanes]: "What parking lot?"
>
> [buzzing sound] [dial tone]

(<u>Id.</u>)  The T-mart convenience store referenced by Harrison was at the corner of Adams Street and East 12th Avenue, approximately half-a-block southwest and one block southeast of where

the police first encountered Harrison.  Defendant Donitka Kay, a sergeant with the BGPD, was the first officer to encounter Harrison.

At approximately 1:39 AM, police dispatch advised Officer Casada of "unknown trouble on 130 West 11th Avenue, one-three-zero West 11th Avenue.  This is a subject that we tracked earlier.  He called back, reference to assaulting and his brother break.  He advised he would be standing by at this location in the parking lot with a gun."  (Audio of Police Radio, Phillips Dep. Ex. 28 [DN 58] recorded on 12-Aug-2012 at 01.38.54 AM, 0:57–1:15.)  At 1:42 AM, Sergeant Todd Porter radioed to dispatch asking for the caller's phone number and whether they knew the caller's name.  The telecommunication officer responding gave Sergeant Porter the number and advised "Negative.  He becomes uncooperative, advising that we're not helping him and that he is going to kill his brother."  (Audio of Police Radio, Phillips Dep. Ex. 28 [DN 58] recorded on 12-Aug-2012 at 01.42.25 AM, 0:39–:48.)  Dispatch found Harrison's approximate location by GPS triangulation on Harrison's cell phone.  Sergeant Porter called Harrison's cell phone and also received his voicemail and learned his first name was "Greg," which Porter advised over the radio.  (Dash-cam video, Phillips Dep. Ex. 30 [DN 58] 0:32–:37, 1:44:42–:47 AM.)

Because the shooting and the preceding events were recorded by a camera affixed to Sergeant Donitka Kay's police car (the "dash-cam video"), the underlying facts of the case are largely undisputed.  The dash-cam footage begins with Sergeant Kay stopping and redirecting traffic on East 11th Avenue.[1]  As Kay is getting back into her cruiser, Sergeant Porter is heard advising over the radio that the subject may possibly be named "Greg."  (Dash-cam video; see Kay Dep. Ex. 5 [DN 41-1] Use of Force Report, Sergeant Donitka Kay, at 1 (Aug. 21, 2012).)  Sergeant Kay drives her cruiser down East 11th Avenue, panning with the spotlight affixed to the

---

[1] The accompanying audio to the dash-cam video starts approximately 20 seconds in.  (See Dash-cam video, Phillips Dep. Ex. 30 [DN 58].)

vehicle.   Officer Wilson and Casada's police cruisers are seen parked on Clay Street perpendicular to East 11th Avenue.  (See Dash-cam video [DN 58].)[2]

Around 1:47 AM, Sergeant Kay turned left onto Clay Street (heading southwest) from East 11th Avenue and spotted a white male, wearing a white T-shirt and blue jeans walking (northeast) in the direction of 11th Avenue on the railroad tracks that are parallel to the 1100 block of Clay Street (between 11th and 12th Avenues).  (Dash-cam video [DN 58] 2:47, 1:46:57 AM.)  Kay stopped her car in the right lane of Clay Street, approximately 30 to 50 yards (or 90 to 150 feet), according to Kay and Casada's later estimates, down the railroad tracks from Harrison.[3]   Kay fixed her cruiser's spotlight on Harrison, alerted dispatch that she was "getting out with suspect on tracks," got out of her cruiser, and then yelled at Harrison to "put your hands up" and "walk up here to me."  (Id.)  Kay asks "are you Greg?" to which the subject yells "yeah."  (Id.)  Kay is also heard yelling to "get off the tracks" and "come here," after which Harrison is seen making a small shuffle down the tracks in Kay's direction.  Kay continues to repeatedly yell, "show me your hands" and "put your hands up," and Harrison is seen standing motionless.

Officers Wilson and Casada, who had been on foot nearby searching for Harrison, heard Kay yelling at Harrison to "show me your hands."  Wilson and Casada ran to Kay's location, and stationed themselves on the passenger side of her cruiser, such that the vehicle was between them

---

[2] Officers Casada and Wilson had been dispatched to Harrison's calls that were traced to the area of the 100 block of West 11th Avenue.  Casada and Wilson arrived at the intersection of Clay and East 11th Avenue and parked their police cruisers on Clay, got out and searched for Harrison on foot.

[3] Sergeant Kay estimated that Harrison was approximately 30 yards from her when she first pulled her cruiser over.  (Kay Dep. Ex. 5 [DN 41-1] Use of Force Report of Sgt. Kay at 2; Kay Dep. [DN 41-1] 144:5–:18.)  Officer Casada estimated that Harrison was approximately 50 yards from Kay's cruiser when he arrived on the scene.  (Casada Dep. [DN 44-1] 59:14–:19.)

Sergeant Kay estimated that Harrison was approximately 15 yards away from her when Officer Casada shot Harrison.  (Kay Dep. Ex. 5 [DN 41-1] Use of Force Report of Sgt. Kay at 2; Kay Dep. [DN 41-1] 144:19–145:4.)  Officer Casada estimated that Harrison was approximately 30 yards in front of Kay's vehicle when he shot Harrison.  (Casada Dep. [DN 44-1] 59:20–60:3.)

and Harrison.[4]  All officers present were wearing bulletproof vests.  (See Kay Dep. [DN 41-1] 67:7–69:8, June 10, 2014; Casada Dep. [DN 44-1] 32:15–:17, June 11, 2014.)  There were five Bowling Green police officers present at the scene (Kay, Casada, Wilson, Steff, and Porter), as well as a Western Kentucky University officer (Brian Kitchens).

During the incident, the police blocked off the road and surrounding area and had the trains stopped.  (See Phillips Dep. Exs. 32–33 [DN 55-1] CAD Report; Dash-cam video [DN 58].)  Between the railroad track and Sergeant Kay and Officer Casada's position was approximately 18 feet of grassy area, a curved concrete wall, (see Scene Photographs, Phillips Dep. Ex. 1 [DN 51-1] Bates Nos. D005725–26), and the left lane of Clay Street, (see BGPD Shooting Drawing, Phillips Dep. Ex. 24 [DN 54-1] Bates No. D00489).[5]  (See Google Map Images, Defs.' Mot. Summ. J. Exs. A–C [DN 61-2, 61-3, 61-4].)  Kay and Casada were in a slightly elevated position as compared to Harrison.  (Casada Dep. [DN 44-1] 32:25–33:2.)

Harrison was intoxicated.  (Kay Dep. [DN 41-1] 29:5–:14 (it was "pretty obvious upon contact" that Harrison was intoxicated); Casada Dep. [DN 44-1] 10:4–:19, 34:13–:15.)  Officers observed Harrison urinating himself while standing on the train tracks during the incident.  (Dash-cam video [DN 58] 6:10–:38, 1:50:20–:28 AM; see Kay Dep. [DN 41-1] 29:11–:14; Casada Dep. [DN 44-1] 10:4–:9.)  They also saw Harrison cry intermittently, (see Kay Dep. Ex. 5 [DN 41-1] Use of Force Report of Sgt. Kay), stumble, (Kay Dep. [DN 41-1] 29:11, 58:4–:9), retrace his steps, and shout to the officers that he wanted to speak to his sister, (see Dash-cam video [DN 58]).  The officers are heard on the dash-cam video telling Harrison that they will call his sister

---

[4]  According to Wilson's incident report, Wilson arrived first and covered Harrison "with his rifle while Sergeant Kay attempted to start a dialogue with" Harrison.  (Kay Dep. Ex. 7 [DN 41-1] Use of Force Report, Officer Jordan Wilson (Aug. 21, 2012).)  After less than a minute, Officer Casada also arrived at the vehicle and began covering Harrison.  (Id.)

[5]  Kay testified that she was seven or eight yards from the railroad tracks at their closest point.  (Kay Dep. [DN 41-1] 150:13–:24.)

once he shows them his hands.  (Dash-cam video [DN 58] 8:23, 1:52:33 AM; see Kay Dep. [DN 41-1] 58:14–59:17.)  Officer Casada testified that Harrison had his left arm behind his back and was waving his right arm in the air and screaming, that he appeared sweaty, had slurred speech, and his pants looked wet, possibly from urinating on himself, and that given his behavior it was a "good possibility" that Harrison was intoxicated.  (See Casada Dep. [DN 44-1] 10:4–:19.)

During the approximately twelve-minute exchange, Officer Casada and Sergeant Kay continually and repeatedly yelled to Harrison to "stop," "stop and put your hands up," "stop, don't move," "stop or I will shoot you," and "sit down."  While Harrison is visible in the dash-cam video from Sergeant Kay's vehicle, he is generally standing in one place.  For the first five minutes of the encounter (1:47–:52 AM), he is stationary, though he occasionally turned to face the other direction and turned back, he does not walk anywhere.  For the next four minutes (1:52–:56 AM), Harrison occasionally takes a step or two down the railroad tracks in the direction of 11th Avenue and twice retraces his steps back in the direction of 12th Avenue, always stopping in response to the officers' yelled commands.  At one point, Harrison is seen reaching with his right hand into his right front pocket and then into his left front pocket with what appears to be some difficulty in getting his hand in his pocket.  The officers yell "Greg, show us your hands" and Harrison straightens up.  (1:55:44–:49 AM.)  At approximately 1:56 AM, Harrison takes another step down the railroad tracks toward 11th Avenue and is no longer visible from the dash-cam.

According to Wilson's Statement, because Harrison did "not respond to any attempts to show his hands, get on the ground, or respond to any questions or attempts to deescalate the situation," Wilson "decided to change positions to get a different angle and possibly determine whether [Harrison] was armed."  (See Kay Dep. Ex. 7 [DN 41-1] Use of Force Report, Officer

Case 1:13-cv-00124-JHM-LLK   Document 90   Filed 02/24/16   Page 8 of 67 PageID #: 2552

Jordan Wilson (Aug. 21, 2012).)  Wilson took up a position between 1131 and 1137 Clay Street, which put him directly across from Harrison and in a position to observe Harrison from concealment.  (Id.; see also Kentucky State Police NIBRS Initial Report and Supplementary Reports, Phillips Dep. Ex. 9 [DN 52-1] Interview by Sgt. Phillips with Ofc. Wilson (Aug. 30, 2012).))  From this position, Wilson was still unable to determine if anything was being held in Harrison's left hand, which was concealed in his pants behind his back.  (Id.)

Officer Ernie Steff was also on the scene, located behind Harrison, and thus somewhat in the line of fire from Officer Casada and Sergeant Kay.  Steff took cover behind a large concrete foundation and some small trees.  According to Steff's Use of Force Report, Harrison heard Steff's approach and started yelling about someone being behind him, but he could not see Steff because of Steff's cover.  Steff stated that he "was able to see Harrison briefly but the officers positioned on Clay Street was [sic] washed out by spotlights and blue lights."[6]  (Kay Dep. Ex. 8 [DN 41-1] Use of Force Report, Officer Ernie Steff (Aug. 20, 2012); see Steff Dep. [DN 39-1] 30:4–:15, Aug. 13, 2014.)  Steff observed Harrison with one arm behind his back with his hand shoved down his pants, which caused Steff to be unable to verify if Harrison had a weapon or not.  (Steff Dep. [DN 39-1] 28:13–:16, 29:24–30:8, 30:19–:23 (testifying that Harrison's hand was actually inserted into his blue jeans behind his back).)  Steff relayed this over the radio to the other officers and stated he was going to change position and try to get a better view.  (Kay Dep. Ex. 8 [DN 41-1] Use of Force Report of Ofc. Steff.)

Throughout the exchange, Harrison stayed within the railroad tracks, moving parallel to Casada and Kay.  (See Kay Dep. [DN 41-1] 47:17–:21; 33:21–:23 (Harrison never stepped over nearest railroad track toward Kay and Casada); 83:3–:10 (Harrison never moved in any direction

---

[6] Officer Casada testified that the searchlight pointed at Harrison might have made it difficult for Harrison to see Casada and Kay clearly.  (Casada Dep. [DN 44-1] 33:11–:15.)

toward Kay other than down the railroad track between the rails; clarifying Sgt. Porter's interview), 150:4–152:13; Casada Dep. [DN 44-1] 60:4–:8.)   Throughout the encounter, Harrison's left hand remained out of view, either behind his back and/or tucked into the waistband of his pants, (see Kay Dep. [DN 41-1] 30:11–:18, 58:10–:13 (Harrison never moved his left hand); Casada Dep. [DN 44-1] 10:4–:13, 41:21–42:1), and attempts to view him from different angles were unfruitful.   According to Kay's Use of Force Report, Harrison turned his back towards her and Casada twice during the incident and "[d]uring those two times that Greg had his back to Officer Casada and I, I could not see if [sic] Greg's hand.  Greg had his hand stuck so far down his pants that could only see from his wrist up." (Kay Dep. Ex. 5 [DN 41-1] Use of Force Report of Sgt. Kay at 2.)[7]  Harrison did not obey the officers' orders that he show what was in his left hand or to sit down.  (See Dash-cam video [DN 58]; Kay Dep. [DN 41-1] 103–04.)  Harrison was not running from or otherwise attempting to elude the police.  (Dash-cam video [DN 58].)

At 1:57 AM, Sergeant Kay advised over the police radio "that if he takes one more step this way, uh, we're shootin'."  (Dash-cam video [DN 58] 12:48, at 1:56:57 AM; Audio of Police Radio, Phillips Dep. Ex. 28 [DN 58] recorded on 12-Aug-2012 at 01.56.57 AM.)   Sergeant Porter advised Sergeant Kay and Officer Casada to tell Harrison they were going to shoot him, which they did.  (Id.)

---

[7] Casada testified in his deposition that he saw something black in Harrison's hand that he believed to be "the butt of a gun," (see Casada Dep. [DN 44-1] 34:1–:12).  The first mention of this by Casada was in his Use of Force Report that he signed on August 16, 2012.  (See Kay Dep. Ex. 6 [DN 41-1] Use of Force Report, Officer Keith Alan Casada, at 2 (Aug. 16, 2012).)  However, this is inconsistent with the dash-cam video and police radio, where Casada never reported to seeing something of that kind, and Casada's interview with Sergeant Phillips on August 14, 2012, where Casada never mentions it (see KSP NIBRS Report, Phillips Dep. Ex. 9 [DN 52-1] Interview by Sgt. Phillips with Ofc. Casada (Aug. 14, 2012)).  It is also inconsistent with Sergeant Kay's testimony and Use of Force Report, wherein she stated that "[d]uring those two times that Greg had his back to Officer Casada and I, I could not see if [sic] Greg's hand.  Greg had his hand stuck so far down his pants that could only see from his wrist up." (Kay Dep. Ex. 5 [DN 41-1] Use of Force Report of Sgt. Kay at 2.)  Further, Officer Steff was behind Harrison about 30 feet away and could not see anything in Harrison's hand, as it "was completely down inside his blue jeans.  So I could not see his hand nor if he had anything in it." (Steff Dep. [DN 39-1] 26:3–:6, 28:3–:16.)  Defendants do not mention Casada's testimony on this in their motion.

A minute-and-half later, Sergeant Kay reports over the police radio that Harrison has apologized to his mom for whatever it is he is about to do. (Dash-cam video [DN 58] 14:32, at 1:58:42 AM; Audio of Police Radio, Phillips Dep. Ex. 28 [DN 58] recorded on 12-Aug-2012 at 01.58.32 AM.) Following the mom-forgive-me statement, Casada asks Kay to go around to the driver's side of her cruiser and manually adjust the searchlight in an effort to keep Harrison illuminated as he gradually made his way down the railroad tracks. (Casada Dep. [DN 44-1] 30:8–32:24; Kay Dep. [DN 41-1] 148:21–149:2.) At 1:59 AM, Kay is heard on the dash-cam video saying "cover me" and immediately thereafter, the spotlight on the left side of the frame moves position. (See Dash-cam video [DN 58] 14:55, at 1:59:05.) Kay then returns to the passenger side of the cruiser.

Just before 2:00 AM, Officer Casada shoots Harrison, hitting him in the left upper abdomen. (See Dash-cam video [DN 58] 15:36, at 1:59:46 AM; Audio of Police Radio, Phillips Dep. Ex. 28 [DN 58] recorded on 12-Aug-2012 at 1.59.32 AM.) Harrison was not facing Kay and Casada when the shot was fired. (See Autopsy Report [DN 54-1] 5 (projectile of bullet indicates that Harrison was not facing Kay and Casada when shot).) Casada testified that Harrison was at approximately a 45 degree angle to him, (Casada Dep. [DN 44-1] 40:17–41:20), at a distance determined later to be 71.9 feet from Casada, (KSP NIBRS Report, Phillips Dep. Ex. 9 [DN 52-1] Trooper Lonnie Hodges Supp. (Aug. 27, 2012)). Kay and Casada were on the passenger's side of Kay's cruiser when Casada fired the shot. Kay was not looking at Harrison when the shot was fired; she was somewhat crouched behind her vehicle, radioing to other officers. (See Kay Dep. [DN 41-1] 36:5–:24.)

Officers then converged on Harrison and called for ambulance. Harrison was taken to the hospital, where he succumbed to his injury and was pronounced dead later that morning. The

Kentucky State Police investigated the shooting.  The lead detective of the investigation was then-Detective Laura (Isenberg) Phillips.[8]  Sergeant Phillips presented the investigation's evidence to the Commonwealth Attorney on August 30, 2012, and he declined criminal prosecution regarding this incident.  (See Phillips Dep. [DN 50-1] 78:21–79:6.)

Carey Woodcock, as administratrix of the estate of Gregory Harrison, filed this action in this court in August 2013, seeking damages.  The Complaint includes claims for: excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count I); negligence and gross negligence (Count II); vicarious liability against Defendants City of Bowling Green, Hawkins, Wiles, and Watts for the state-law claims against Defendants Kay and Casada (Count III); common-law battery (Count IV); the tort of outrage (intentional infliction of emotional distress) (Count V); wrongful death under KRS 411.130 (Count VI); and violation of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq. (Count VII).  (See 2d Am. Compl. [DN 84].)  Both parties have filed motions for summary judgment.

## II.  STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

---

[8] Since the incident, Detective Isenberg has been promoted to Sergeant Phillips and changed her last name to Phillips.  (See Phillips Dep. [DN 50-1] 14:8–:10, 87:21–:23, Feb. 5, 2015.)

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

The summary judgment standard does not change when a court is presented with cross-motions for summary judgment. Profit Pet v. Arthur Dogswell, LLC, 603 F.3d 308, 312 (6th Cir. 2010) (citing Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)). "The fact that both parties have moved for summary judgment does not mean a court must grant judgment as a matter of law for one side or the other; rather, a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Id. (quoting Taft, 929 F.2d at 248).

### III. DISCUSSION

Plaintiff moves for summary judgment on "liability against Defendants Donitka Kay and Keith Casada," arguing that their "decision to shoot Gregory Harrison was objectively unreasonable and therefore constituted excessive force, negligence[,] and battery as a matter of law, and negligence *per se*." (Pl.'s Proposed Order [DN 60-3] 1.) Defendants move for summary judgment on all claims against them [DN 61].

**A.  Dismissal of Certain Claims**

Plaintiff, in her response brief to Defendants' Motion for Summary Judgment, stated she has no objection to the dismissal of her claims: (1) against Defendant Kevin Wiles; (2) against Defendant Melanie Watts; (3) of conspiracy involving anyone other than Defendants Kay and Casada; (4) under Title II of the Americans With Disabilities Act; and (5) of battery against anyone other than Defendant Casada.  (See Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 1.) Accordingly, those claims are **DISMISSED with prejudice**.

**B.  Section 1983 (Count I)**

Plaintiff brings claims under 42 U.S.C. § 1983 against the City of Bowling Green, Chief Doug Hawkins, Sergeant Donitka Kay, and Officer Keith Casada for violation of Harrison's constitutional rights.  Section 1983 of Title 42 of the United States Code imposes civil liability on those individuals who, acting under color of state law, deprive a citizen of, among other things, his federally guaranteed constitutional rights.  Brosseau v. Haugen, 543 U.S. 194, 197–98 (2004).  To state a claim under § 1983, a plaintiff must set forth facts that, when favorably construed, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law.  Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006) (citing West v. Atkins, 487 U.S. 42, 48 (1988)); see also Miller v. Sanilac Cnty., 606 F.3d 240, 247 (6th Cir. 2010).  Because "[s]ection 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced," the Court's "first task . . . is to identify the specific constitutional . . . rights allegedly infringed."  Meals v. City of Memphis, 493 F.3d 720, 727–28 (6th Cir. 2007) (citations omitted).  In this case, Plaintiff contends that Defendants, acting under the color of state law, violated Harrison's Fourth Amendment rights by using excessive force, acting with

deliberate indifference by failing to train and supervise, failing to employ qualified persons, and failing to promulgate appropriate operating policies and procedures either formally or by custom. The parties do not dispute that Officers Kay and Casada were acting under the color of state law during the incident at issue in this case.

In resolving a claim of excessive force, each defendant's liability must be assessed individually based on his or her own actions.  Pollard v. City of Columbus, Ohio, 780 F.3d 395, 402 (6th Cir.), cert. denied, 136 S. Ct. 217 (2015).  "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force."  Id. (quoting Binay v. Bettendorf, 601 F.3d 640, 650 (6th Cir. 2010)).

**1.  § 1983 Claim against Casada for Excessive Force**

Plaintiff contends that Officer Casada violated Harrison's Fourth Amendment right to be free from excessive force.  Plaintiff moves for summary judgment on her § 1983 claim against Casada, arguing that Casada's decision to shoot Harrison was objectively unreasonable. Defendants argue that they are entitled to summary judgment on Plaintiff's § 1983 individual capacity claim against Casada (1) because Casada did not use excessive force as Casada's actions were objectively reasonable under the Fourth Amendment and (2) because Casada is entitled to qualified immunity.

The doctrine of qualified immunity shields government officials performing discretionary functions from civil liability insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The immunity is "immunity from suit rather than a mere defense to liability."   Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).   The Supreme Court has recognized a two-part test for determining whether a defendant is entitled to qualified immunity.   Generally, the first step in a qualified immunity analysis is to ask whether the officer's conduct violated a constitutional right. Pearson, 555 U.S. at 232.   If a constitutional right was violated, the second step is to ask whether the right was clearly established at the time of the violation, such that "a reasonable officer confronted with the same situation would have known that using deadly force would violate that right."   Chappell v. City Of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009).   These two inquiries may be addressed in any order.   Pearson, 555 U.S. at 236.

### a.  No Genuine Dispute of Material Fact Exists

In this case, as both parties acknowledged at oral argument, there is no dispute as to the material facts that occurred regarding the shooting of Harrison.   That is, there is not "a dispute over *which set of facts to believe*," as the Court is "not presented with 'dueling accounts of what happened.'"   Pollard, 780 F.3d at 401 (quoting Romo v. Largen, 723 F.3d 670, 670 (6th Cir. 2013)).   The Supreme Court stated in Scott v. Harris, 550 U.S. 372 (2007), that when the material facts are not in dispute, the reasonableness of the use of force "is a pure question of law," expressly rejecting Justice Stevens's argument in dissent that "[w]hether a person's actions have risen to a level warranting deadly force is a question of fact best reserved for a jury."   550 U.S. at 381 n.8; id. at 395 (Stevens, J., dissenting); see Chappell, 585 F.3d at 909 (quoting Scott, 550 U.S. at 381 n.8) ("At the summary judgment stage, once the relevant set of facts is determined and all reasonable inferences are drawn in favor of the plaintiff, to the extent supported by the record, the question whether the detectives' actions were objectively unreasonable is 'a pure question of law.'"); Dunn v. Matatall, 549 F.3d 348, 353 (6th Cir. 2008)

("<u>Scott</u> . . . instructs us to determine as a matter of law whether the events depicted on the video, taken in the light most favorable to [the plaintiff], show that the Officers' conduct was objectively reasonable."); <u>Marvin v. City of Taylor</u>, 509 F.3d 234, 244 (6th Cir. 2007) (same). The parties here do not disagree about what happened, but instead disagree about the legal implications of those undisputed facts—namely, whether Casada's use of deadly force was objectively reasonable.  This is a pure question of law for the Court to determine.  <u>Scott</u>, 550 U.S. at 381 n.8; <u>Chappell</u>, 585 F.3d at 909; <u>see</u> <u>Pollard</u>, 780 F.3d at 401 (plaintiff argued Sixth Circuit did not have jurisdiction to entertain the officers' interlocutory appeal of the district court's denial of officer's motion for summary judgment based on qualified immunity; plaintiff asserted that suspect was unarmed, injured, and trapped in a car when shot by officers; officers did not dispute that account, just simply maintained that, despite being unarmed, injured, and trapped, suspect was still a threat, first, because he appeared to have a gun, and, second, because they had strong reason to believe he would use the gun; court found that because officers conceded the facts in the light most favorable to the plaintiff, they raise a pure issue of law); <u>see also</u> <u>Ramirez v. Knoulton</u>, 542 F.3d 124, 128 (5th Cir. 2008); <u>Luna v. Mullenix</u>, 765 F.3d 531, 544–46, 550 (5th Cir.) (King, J., dissenting), <u>opinion withdrawn and superseded</u>, 773 F.3d 712 (5th Cir. 2014) <u>cert. granted, decision rev'd</u>, 136 S. Ct. 305 (2015) and <u>reh'g denied</u>, 777 F.3d 221 (5th Cir. 2014).

### b.  Constitutional Violation

The federal right at issue here is Harrison's right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person.  <u>Graham v. Connor</u>, 490 U.S. 386, 388, 395 (1989).  It is undisputed that Casada's use of deadly force was a "seizure" of Harrison under the Fourth Amendment.  <u>Tennessee v. Garner</u>,

471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). A claim that a government official used excessive force during the course of a seizure is analyzed under the Fourth Amendment's "objective reasonableness" standard. Id. Thus, in answering whether Casada violated Harrison's constitutional rights, the Court must determine whether his use of deadly force was objectively reasonable under the Fourth Amendment.

The test for whether an officer's use of force violates the Fourth Amendment is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Graham, 490 U.S. at 397. This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Garner, 471 U.S. at 8). Application of the objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. This non-exhaustive list of factors "help[s] inform our ultimate inquiry, which must always be 'whether the totality of the circumstances' justified the use of force." Mullins v. Cyranek, 805 F.3d 760, 765 (6th Cir. 2015) (quoting Livermore v. Lubelan, 476 F.3d 397, 404 (6th Cir. 2007)); see Garner, 471 U.S. at 8–9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

As in other Fourth Amendment contexts, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation." <u>Graham</u>, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396–97. In making this judgment, the Court must be careful not to substitute "our personal notions of proper police procedure for the instantaneous decision of the officer at the scene." <u>Smith v. Freland</u>, 954 F.2d 343, 347 (6th Cir. 1992). Rather, the Court must adopt a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." <u>Burchett v. Kiefer</u>, 310 F.3d 937, 944 (6th Cir. 2002). After all, "[w]hat constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." <u>Dickerson v. McClellan</u>, 101 F.3d 1151, 1163 (6th Cir. 1996) (citation omitted). As to the specific question of deadly force, the Sixth Circuit has stated that a minimum requirement for the use of deadly force is that there is probable cause to believe that the suspect poses an imminent threat of serious physical harm, either to the officers or to others. <u>See</u> <u>Mullins</u>, 805 F.3d at 766 (citing <u>Untalan v. City of Lorain</u>, 430 F.3d 312, 314 (6th Cir. 2005)).

Plaintiff first asserts that <u>Garner</u> "required three factors to be present to justify the use of lethal force: (1) the person must be suspected of committing a felony; (2) s/he must be trying to escape; *and* (3) s/he must present at least an immediate threat of serious physical harm to the officer or others." (Pl.'s Mot. Summ. J. [DN 60] 4.) Plaintiff then contends that there is no genuine issue of fact that (1) "Harrison was guilty of, at most, a misdemeanor offense or

offenses, which lacked the severity to justify the use of lethal force"; (2) "Harrison did not pose an immediate risk to the safety of Defendants or others"; and (3) "Harrison was neither actively resisting arrest or attempting to evade arrest by flight when he was shot." (Id. at 5.) Plaintiff concludes that given these undisputed facts, no reasonable juror could believe Defendants' claim that "Harrison presented such a risk that he had to be shot," and thus, "Defendants' conduct constituted excessive force as a matter of law." (Id.)

The Court disagrees with Plaintiff's premise regarding the mandatory nature of the Garner factors. The Supreme Court in Scott v. Harris, 550 U.S. 372 (2007), expressly rejected a reading of Garner offered by the respondent in that case that is substantially similar to that proposed by Plaintiff in this case. See id. at 381–83. The Court stated the "argument falters at its first step; Garner did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' Garner was simply an application of the Fourth Amendment's 'reasonableness' test, Graham, [490 U.S.] at 388, to the use of a particular type of force in a particular situation." Harris, 550 U.S. at 382.[9]

The Court also disagrees with Defendants to the extent that they imply that the Graham factors are only to be considered in a "fleeing felon" situation. Courts routinely apply these factors when determining objective reasonableness of an excessive force claim in a wide variety of circumstances, not only those involving fleeing felons. E.g., Burchett, 310 F.3d at 944;

---

[9] In Tennessee v. Garner, 471 U.S. 1 (1985), the Supreme Court invalidated a state law authorizing police to exercise deadly force when apprehending even unarmed, non-dangerous fleeing felony-suspects. Id. at 11. Garner involved the fatal shooting of a 14-year-old youth by an officer who saw him fleeing from a burglary scene, commanded him to stop, and shot him in the back of the head when he did not obey the officer's command, killing him. Id. at 4–5. The Court held that a governmental policy that allows the use of deadly force against *all* fleeing felons violates the Fourth Amendment; the use of deadly force to prevent escape is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Id. at 11. The Court stated that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Id. at 11–12.

Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 174 (6th Cir. 2004).  Thus, while not "rigid preconditions," this non-exhaustive list of factors is relevant to the Court's ultimate inquiry into whether an officer's use of deadly force was objectively reasonable under the totality of the circumstances.  Mullins, 805 F.3d at 765 (citing Sigley, 437 F.3d at 534).  Considering the Graham factors, as well as other relevant factors, from the perspective of a reasonable officer on the scene and not using hindsight, the Court concludes that the use of deadly force in this case was not objectively reasonable.

    *Severity of the Crime*.  The Court finds that the severity-of-the-crime inquiry weighs against Casada.  Plaintiff contends that Harrison was guilty of, at most, a misdemeanor offense or offenses, which lacked the severity to justify the use of lethal force.  In this case, the officers were dispatched to Harrison's location not to arrest him, but to investigate Harrison's threats of violence and respond to Harrison's request for help.  See Glenn v. Washington Cnty., 673 F.3d 864, 874 (9th Cir. 2011) (noting that officers were called not to report a crime, but to seek help for their emotionally disturbed son); Deorle v. Rutherford, 272 F.3d 1272, 1280–81 (9th Cir. 2001) (noting that officers were called "not to arrest him, but to investigate his peculiar behavior [as] Deorle was clearly a deeply troubled, emotionally disturbed individual").  Sergeant Kay testified that at no point were the officers trying to arrest Harrison.  (Kay Dep. [DN 41-1] 115:1–:14.)  Further, Kay testified that she was unaware of any offense that Harrison had committed at the time he was shot other than refusing to follow the orders of the police.  (See Kay Dep. [DN 41-1] 112:18–:25.)

    Plaintiff states that even using the benefit of 20/20 hindsight, at the time Harrison was shot, he was at most guilty of: public intoxication (misdemeanor), KRS 525.100; disorderly conduct (misdemeanor), KRS 525.055 and 525.060; terroristic threatening (misdemeanor), KRS

508.080(1); resisting arrest (misdemeanor), KRS 520.090; and/or trespassing on railroad property (misdemeanor), KRS 277.350 and 511.070. The Court agrees with Defendants that it is not necessarily the felony/misdemeanor distinction that is relevant; so much as, it is the severity of the crime at issue. The only crime Harrison potentially committed that goes to the heart of Garner's standard—"crime[s] involving the infliction or threatened infliction of serious physical harm," Garner, 471 U.S. at 11—was terroristic threatening, a Class A misdemeanor, for his threats regarding his brother/family during his calls to the police. While those threats are serious, Harrison's family was not at the scene and Harrison did not attack the officers or anyone else, or threaten to do so at any point while the officers were on the scene. Compare Pollard, 780 F.3d at 399 (suspect with warrant for crimes of forcible rape, assault with a deadly weapon, burglary, and kidnapping led officers on high-speed chase before crossing highway median and ramming head on into semitrailer), with Garner, 471 U.S. at 21–22 (noting that although burglary is a serious crime, it is a "property" crime, not a "violent" crime and that it is not so dangerous as automatically to justify the use of deadly force); Solomon, 389 F.3d at 174 (noting that trespassing is "a minor offense and certainly not a severe crime that would justify the amount of force used," which included slamming suspect against wall and forcibly bending her arm until it broke).

> In Bouggess v. Mattingly, the court stated that
>
> It cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of *serious* physical harm to the officer or to others.

482 F.3d 886, 891 (6th Cir. 2007). Here, Harrison was not even *physically* resisting the officers; he was simply passively noncompliant. In Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001), the plaintiff "brandish[ed] a hatchet" and a crossbow, was verbally abusive to officers,

21

threatening to "kick [their] ass," and continually roamed about his property despite officers' orders.  272 F.3d at 1276–77.  Nonetheless, the Ninth Circuit did not consider this sufficient active resistance to warrant use of a beanbag shotgun.  Id. at 1282–85.  Rather, the court noted that "the crime being committed, if any, was minor."  Id. at 1282.

  *Actively Resisting Arrest or Attempting to Evade Arrest by Flight*.  Turning to the third factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," Graham, 490 U.S. at 396, the Court finds that it, too, weighs against Casada.  First, the officers were not even trying to arrest Harrison at the time he was shot.  Further, no one contends that Harrison tried to flee before Casada shot him.  Kay testified that Harrison was not trying to escape, run away from the police, or hide at any point during the incident.  (Kay Dep. [DN 41-1] 112:14–:17.)  Whether Harrison was "actively resisting arrest" is more complicated.  As noted, the officers were not trying to arrest Harrison at the time he was shot, thus Harrison could not logically have been "actively resisting arrest."  However, the Court finds that Harrison's level of resistance is relevant to the constitutional inquiry.  See Untalan, 430 F.3d at 317 (finding it could consider the fact of the suspect's resistance to officer's efforts to restrain him even though suspect had not been informed he was under arrest and thus it did "not fit the wording of Graham perfectly").  Significantly, Harrison "'did not attack the officers' or anyone else, nor did he threaten to do so at any point while officers were on the scene."  Glenn, 673 F.3d at 875 (quoting Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005)).  Rather, he moved down the railroad tracks a few steps at a time, sometimes retracing his steps, while staying within the railroad tracks from the time the officers arrived and took no threatening actions (other than noncompliance with shouted orders).  See id.  In Smith, 394 F.3d 689, the Ninth Circuit held that the plaintiff's refusal to obey officers' commands to remove his hands from his pockets to show

police whether he was armed, as well as his entry into his home despite officers' orders and his brief physical resistance were "not . . . particularly bellicose." 394 F.3d at 703. <u>Smith</u> and <u>Glenn</u> are similar to this case in that the crux of the resistance was the refusal to follow officers' commands, rather than actively attacking or threatening officers or others.

*Probable Cause to Believe Harrison posed an Imminent Threat of Serious Physical Harm to Officers or to Others*. The question of whether there was probable cause to believe that Harrison posed an imminent threat of serious physical harm to officers or to others is the crux of this case. Both parties appear to agree on this point. "In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" <u>Mullins</u>, 805 F.3d at 766 (quoting <u>Untalan</u>, 430 F.3d at 314). The reasonableness of the use of deadly force is measured "at a particular time based on an 'objective assessment of the danger a suspect poses at that moment.'" <u>Id.</u> (quoting <u>Bouggess</u>, 482 F.3d at 889).

Plaintiff contends that there is no objective evidence that Harrison posed a threat to the officers or anyone else. (Pl.'s Mot. Summ. J. [DN 60] 14 ("Based on what Defendants Kay and Casada knew at the scene of the shooting, . . . there were no objective facts to support their belief that they or anyone else was at risk of serious physical harm or death when they decided to shoot Mr. Harrison. In addition to what Defendants themselves knew, the circumstantial evidence does not support any inference of such a risk: . . . .").) Plaintiff characterizes the situation as Harrison doing nothing when he was shot except taking one more step down a railroad track with his left hand behind his back. Harrison had been consistently non-compliant with those commands, stumbling, slurring, had urinated on himself, and appeared intoxicated.

Here, under the totality of the circumstances, there was not probable cause to believe that Harrison presented an imminent threat of serious physical harm to the officers or to others. The officers knew from the police radio that Harrison had called the police department twice that night; that his name was possibly Greg; that he had a gun, based upon Harrison's statement in the phone call, not upon personal observation of Harrison with a gun, as no one observed Harrison with a gun or a weapon of any kind; that he had called the police asking for their help (see Casada Dep. [DN 44-1] 9:14–:20 ("I believe the comments he made to dispatch was that he was not getting any help or we were not helping him. And I can't remember the specifics, other than that call was tracked to that location area.")); and that he had stated he wanted to assault or wanted to kill his brother. The officers knew from arriving at the scene and observing Harrison that he had on a white T-shirt, blue jeans, and had brown shaggy hair; he had his left arm behind his back and was waving his right arm in the air and screaming; he appeared sweaty, had slurred speech, and his pants looked wet, possibly from urinating on himself; given his behavior it was a "good possibility" that Harrison was intoxicated. It is undisputed that Harrison was noncompliant with the officers' commands to "show your hands" and "sit down."

Defendants contend that Casada acted reasonably in the situation he confronted, which Defendants characterize as a "dynamic scene" created by Harrison's repeated refusals to follow officers' orders. Defendants rely on Pollard v. City of Columbus, 780 F.3d 395 (6th Cir. 2015), but the facts of Pollard are clearly distinguishable from this case. In Pollard, a rape suspect under surveillance left his apartment and drove off in his vehicle. There was a warrant for his arrest on several charges and the police sergeant ordered for a marked cruiser to make the arrest because the suspect was potentially armed. Id. at 398–99. The suspect refused to stop and led four police vehicles on a highway car chase before crossing the median, accelerating the wrong

way, and ramming head-on into a semitrailer.  Id.  Officers surrounded the suspect's vehicle as it was radioed that the suspect had a concealed-carry permit (information that later proved false). Id. at 399.  The officers fatally shot the suspect after he reached down into the car, despite police commands to "show his hands," and after clasping his hands into a shooting posture, pointing them at the officers.  Id. at 400.

Here, there was no warrant issued for Harrison's arrest, let alone for violent offenses such as forcible rape, assault with a deadly weapon, burglary, and kidnapping as there was in Pollard. There was no clear die-before-surrender mentality as exhibited by driving a car head-on into a semitrailer.  See Pollard, 780 F.3d at 403 ("Additionally, the officers knew Bynum was determined to avoid arrest, even at the expense of others' safety and his own life.  In fact, Bynum was so determined to avoid arrest he chose to engage in a high-speed car chase and drive head-on into a semitrailer rather than surrender.  Bynum 'had proven he would do almost anything to avoid capture.'" (quoting Smith, 954 F.2d at 347)).  Unlike in Pollard, where the officers were faced with a split-second decision in a situation that unfolded quickly, the officers here had twelve minutes to assess the situation before Casada fired at Harrison, see Kirby v. Duva, 530 F.3d 475, 482–83 (6th Cir. 2008) ("Finally, and critically, defendants had sufficient time under plaintiffs' account to assess the situation before firing several rounds at Kirby.").  Moreover, there was no sudden, unexpected escalation of events giving rise to a serious physical threat to the officers or to others like there was in Pollard, 780 F.3d at 403–04 (officers, who originally approached suspect's vehicle post-collision without hesitation thinking suspect was unconscious, "shot *after* a dramatic change in circumstances—after Bynum regained consciousness and made gestures suggesting he had a weapon, gestures he continued to make even after officers told him to 'Drop it' and 'Don't do it'"); see Mullins, 805 F.3d at 767 (officer faced with "rapidly

escalating situation" when, during stop and frisk where suspect physically struggled with officer, within a five-second span, suspect removed previously concealed firearm without any direction from officer to do so, had his finger on the trigger, threw the weapon over officer's shoulder after being commanded to drop it, and officer shot suspect twice).   Here, at the moment he was shot, Harrison was on the railroad tracks, not directly facing the officers, taking a step/steps in the direction of 11th Avenue, as he had numerous times throughout the 12-minute encounter, with his left hand still behind his back in his waistband, as it had been throughout the 12-minute encounter, and having made no threats against the police.   Contra Untalan, 430 F.3d at 315 ("Armed with a butcher knife, Ronnie suddenly burst out of the kitchen and lunged at Officer Wolford.   Ronnie attacked Wolford and caused him to drop to the ground.   Officer Kopronica shot Ronnie within seconds of this attack, after Ronnie had tried to get up off of the couch, while Ronnie was struggling for the butcher knife on the couch with Romeo.").   In addition to there being no split-second judgment to be made, Plaintiff emphasizes that not only had Harrison not suddenly done something out of the ordinary from the preceding twelve minutes, but that Kay testified that Harrison's shooting was the result of an agreement she reached with Casada to shoot Harrison if he moved past the point illuminated by the searchlight on her cruiser.   (See Pl.'s Mot. Partial Summ. J. [DN 60] 15–16 (quoting Kay Dep. [DN 41-1] 19–22).)

Defendants contend that by continually refusing to show the officers' both hands and keeping one hands in his pants, Harrison acted as though he had a gun.   It was unknown to the officers at the scene whether Harrison had a weapon, as Harrison had told the 9-1-1 operator that he had a gun, but one hand (his left) remained out of view, behind his back and tucked into the waistband of his pants, and attempts to view him from different angles were unfruitful and Harrison did not respond to officers' instructions to put his hands up.   As Defendants note, the

fact that Harrison was actually unarmed when he was shot is beside the point, see Mullins, 805 F.3d at 767–68; Pollard, 780 F.3d at 403, what matters is what a reasonable officer in their position would have done, knowing what the officers knew, id.  However, unlike in Pollard, where the suspect "extended his arms and clasped his hands into a shooting posture, pointed at the officers," 780 F.3d at 400, Harrison made no such movements or gestures to indicate that he had a gun, let alone to indicate that he was pointing a weapon at the officers.  Both officers testified in their depositions that Harrison never even moved his left hand.  Thus, even if Harrison had been concealing a weapon in his left hand, there is no evidence that he made any aggressive movements with it or threatened officers with it in any way.  Further, during the 12-minute encounter with the police, Harrison never claimed he had a gun, never brandished anything that appeared to be a weapon, and never threatened anyone.

Defendants argue that "Harrison's final declaration—asking his mother for forgiveness for what he was about to do—followed by his failure to show both hands while advancing upon Kay and Casada beyond the reach of the cruiser's spotlight reasonably created the impression that Harrison posed a serious threat of bodily injury."  (Defs.' Mem. Supp. Summ. J. [DN 61-1] 14.)  Defendants emphasize what they characterize as Harrison's "final declaration," the alleged statement by Harrison to the effect of "momma, please forgive me."  According to Sergeant Phillips's KSP Report following her interview with Sergeant Kay, Kay stated that she felt, after hearing Harrison mutter something that she interpreted to be Harrison apologizing to his mother for what he was about to do, that whatever Harrison was going to do was imminent.  (KSP NIBRS Report, Phillips Dep. Ex. 9 [DN 52-1] Interview by Sgt. Phillips with Sgt. Kay (Aug. 14, 2012).)  When asked in his deposition whether Harrison had "indicate[d] that he had any intent whatsoever to visit harm upon any members of the [BGPD] that were out on that scene other

than his movements?"  Casada responded "Yes" and referenced the same "mama, forgive me for what I'm about to do" statement.  (See Casada Dep. [DN 44-1] 38:5–:23.)  Notwithstanding this perceived indication of intent to harm BGPD, Casada then asked Kay to abandon her position of cover on the passenger side of her cruiser and go around to the driver's side of her cruiser and manually adjust the searchlight, in an effort to keep Harrison illuminated as he slowly made his way down the railroad tracks.  (Casada Dep. [DN 44-1] 30:8–32:24; Kay Dep. [DN 41-1] 148:21–149:2.)  Kay is heard on the dash-cam video saying "cover me" and immediately thereafter, the spotlight on the left side of the frame moves position.  Casada testified during his deposition that he did not feel that Kay was in danger, despite that she was moving out from the cover of the car to the side of the car exposed to Harrison, because he had his weapon trained on Harrison and felt absolutely confident that he could shoot Harrison if Harrison made any sudden movements or tried anything.  (Casada Dep. [DN 44-1] 31:7–:23.)  Likewise, Kay testified that while she undertook some additional risk in repositioning the searchlight, as she was no longer covered by her police cruiser and she was "very concerned" about Harrison, she trusted Officer Casada because she knew he had been well trained and was reasonably confident that if Harrison made an aggressive move or pulled a weapon, Casada could shoot Harrison before Harrison shot her.  (Kay Dep. [DN 41-1] 142:9–143:17.)  While the subjective beliefs of Kay and Casada are not material to the objective reasonableness inquiry, a reasonable officer on the scene might perceive that Harrison's "mom, forgive me" statement indicated something imminent was going to happen.  However, an officer exposing herself by abandoning her cover right after that statement and nothing happening decreases the reasonableness of the perception of imminent action.

Furthermore, Harrison was not "advancing upon" Kay and Casada, as Defendants claim. Both Kay and Casada testified that Harrison never stepped over the rails, and thus was travelling parallel to the officers. Kay testified that Harrison never gave any indication that he was going to step over the rail nearest Kay and Casada and come towards them directly. (Kay Dep. [DN 41-1] 152:8–:13.) Casada testified that Harrison had gotten to a point that was close enough to him and Kay that he believed that Harrison presented a risk of death or serious bodily harm to him, if Harrison had a handgun. (See Casada Dep. [DN 44-1] 24:6–:16.) Casada's subjective perception of a threat, of course, are not pertinent to the objective reasonableness inquiry. Graham, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."); see Ashcroft v. al-Kidd, 563 U.S. 731, 1315 S. Ct. 2074, 2080 (2011); Clem v. Corbeau, 284 F.3d 543, 553 n.5 (4th Cir. 2002) (noting that the district court erroneously suggested that the officers subjective actual belief at the time of the shooting had some relevance in determining his entitlement to qualified immunity and stating that the entitlement to qualified immunity depends not on subjective beliefs but rather on the objective reasonable officer on the scene). Plaintiff emphasizes that Harrison was 71.9 feet from Officer Casada at the moment he was shot. In DeMerrell v. City of Cheboygan, 206 F. App'x 418 (6th Cir. 2006), the suspect was 25–30 feet from the officer when the officer shot him. Id. at 428–29. The plaintiff argued that the distance was not close enough to pose an imminent threat to the officer. Id. The Sixth Circuit said it mattered little whether the distance was 25–30 feet or 15–20 feet because the undisputed evidence showed that the suspect was "on a direct path approaching the officers" and aiming his gun at the officers at the time he was shot. Id. Here, by contrast, Harrison was almost 72 feet from the officers, who were barricaded behind

Kay's cruiser, was not on a direct path approaching the officers, but instead was continuing down the railroad tracks parallel to the officers' position, and was not even facing the officers at the time he was shot, let alone pointing a gun at them.

*Whether Warning Given*.  The Court also considers whether officers gave a warning before employing the force, when feasible under the circumstances.  See Garner, 471 U.S. at 11–12; Bouggess, 482 F.3d at 892.  In this case, more than once Casada and Kay yelled warnings like "we're about to shoot you, show us your hands!" and "Stop, Greg, or I'll shoot!"  It seems that Harrison did hear these warnings, as the officers reported that he had responded "shoot me,"[10] although it is unclear whether Harrison understood these warnings because he was intoxicated.[11]  See Glenn, 673 F.3d at 876.

*Suspect's Mental State*.  Plaintiff, relying on Champion v. Outlook Nashville, Inc., 380 F.3d 893 (6th Cir. 2004), asserts that whether a person is mentally ill is a factor to be considered in assessing the reasonableness of the force employed.  Id. at 904.  Plaintiff, citing her police practices expert, argues that Casada and Kay failed to manage properly a situation involving a man who was "obviously drunk, emotionally distraught, and mentally ill."  (Pl.'s Mot. Partial Summ. J. [DN 60] 14.)  Defendants counter that Plaintiff's argument that Harrison was mentally ill "is irrelevant, due to the fact it is undisputed that the officers were not aware of Harrison's mental illness at the time of the incident."  (Defs.' Resp. to Pl.'s Mot. Partial Summ. J. [DN 65] 6.)  Further, relying on Sheffey v. City of Covington, 564 F. App'x 783, 796 (6th Cir. 2014),

---

[10] It is unclear whether Harrison said "shoot me" in response to these warnings or whether Harrison said it prior to receiving these warnings.  For most of the dash-cam video, while it is apparent that Harrison is verbally communicating with the officers, it is hard to make out anything he says.  At 1:49:32 AM, a female voice can be heard saying "sounds like he is screaming shoot me."  In his Use of Force Report, Casada states that Harrison started yelling "shoot me" in response to the warnings the officers gave.  (Kay Dep. Ex. 6 [DN 41-1] Use of Force Report of Ofc. Casada at 2.)

[11] Kay testified in her deposition that she felt Harrison was comprehending her earlier commands because he responded to them with things like "no" and "I can't".  Indeed, on the dash-cam video, when Harrison takes a step or two and the officers shout to "stop" or "stay right there," Harrison would immediately stop and stay put for a time.

Defendants argue that "the Officers' actions cannot be said to be unreasonable based upon perceived mental illness or mental disturbance where the suspect poses an immediate danger to the officers and himself."  (Defs.' Resp. to Pl.'s Mot. Partial Summ. J. [DN 65] 6.)

In making the reasonableness inquiry, a suspect's mental state is one of the factors that must be taken into account, to the extent that it could be known by a reasonable officer on the scene.  See Champion, 380 F.3d at 904 (quoting Deorle, 272 F.3d at 1283) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed.").

As the Deorle court explained:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end.  In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis.  Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

272 F.3d at 1282–83 (internal footnote and citation omitted).  This is not to imply that an officer may never use deadly force against a mentally ill suspect; instead, a suspect's mental state, to the extent it would have been known or apparent to a reasonable officer on the scene, is simply part of the totality of the circumstances making up the reasonableness inquiry.  An officer's actions may be found to be objectively reasonable even if the suspect has a perceived mental disturbance when there is probable cause to believe the suspect poses an imminent threat of serious physical harm either to the officer or to others.  See Sheffey, 564 F. App'x at 795–96; Johnson ex rel.

Estate of Johnson v. Combs, No. 4:04 CV 019 M, 2005 WL 2388274, at *4–5, 2005 U.S. Dist. LEXIS 21634 (W.D. Ky. Sept. 27, 2005).

Here, the officers were faced with a man that was apparently intoxicated, to the point that he had urinated himself, was crying and asking for his sister, was upset that he was not getting help, that appeared to officers to be suicidal, had yelled "shoot me" and stated that he wanted to die, and complained that "the voices won't stop, the voices won't stop."[12]  The court in Sheffey, discussing numerous case citations which represented situations where officers have been found to have used excessive force against people with mental illness, noted that (i) in "nearly all" of the cases, the officers knew of the mental illness with certainty prior to the incident; (ii) in "most" of the cases, the arrestee was known to be unarmed; and (iii) in "each" of the cases, the arrestee had not physically resisted or attacked officers or others.  564 F. App'x 795–96 (citing cases).  Here, the officers did not know with certainty Harrison's mental state prior to the incident.  Further, Harrison was not known to be unarmed in this case, although he also was not known to be armed.  However, Harrison did not physically resist or attack the officers or others, nor did he make any threats against the police or anyone else during their interaction with him.

*Less Intrusive Means of Force*.  Finally, the Court considers whether there were less intrusive means of force that might have been used before officers resorted to shooting Harrison with a gun.  Plaintiff emphasizes that Defendants "never even *considered* the use of less-than-lethal alternatives" in arguing that Casada's use of deadly force was objectively unreasonable. (Pl.'s Mot. Partial Summ. J. [DN 60] 19.)  Defendants, relying on James v. Chavez, 830 F. Supp.

---

[12] There are other facts about Harrison's medical history that were not known to officers at the time of the incident.  (See Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 5 (citing Defs.' Mem. Supp. Summ. J. [DN 61-1] 8–9) (objecting to Defendants inclusion of facts regarding Harrison's medical history and criminal record that were unknown to the officers at the scene).)  As these are facts of which the officers at the scene were unaware and could not have been aware of, the Court does not consider them.

2d 1208 (D.N.M. 2011), contend that Casada was not required to use a less than lethal force.

(Defs.' Resp. to Pl.'s Mot. Partial Summ. J. [DN 65] 7.)  The district court in James stated that

> To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive alternatives.

James, 830 F. Supp. 2d 1208, 1236 (D.N.M. 2011) aff'd, 511 F. App'x 742 (10th Cir. 2013).[13]

The Court agrees that officers need not employ the least intrusive means available, as the ultimate inquiry is whether the force that *was* used was objectively reasonable under the Fourth Amendment.  However, available lesser alternatives are relevant to the totality-of-the-circumstances in determining whether the force used was reasonable.  See Glenn, 673 F.3d at 878 ("[I]t is well settled that officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct.  The available lesser alternatives are, however, relevant to ascertaining that reasonable range of conduct.  Accordingly, the availability of those alternatives is one factor we consider in the Graham calculus."); id. at 876 (quoting Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010)) ("However, 'police are required to consider [w]hat other tactics if any were available,' and if there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate[s] against finding [the] use of force reasonable.'").

Plaintiff argues that the officers' conduct violated applicable police standards, which prescribe ten less-than-lethal force alternatives, including pepper spray, Tasers, tear gas, pepper ball, and beanbag rounds.  (See BGPD Policy and Procedure Manual, Kay Dep. Ex. 4 [DN 41-1]

---

[13] The district court cites Graham v. Connor, 490 U.S. at 397, as support for this proposition, but a review of Graham reveals it says nothing about the relevance of the availability of less intrusive alternatives.

3.1.6 Use of Force Policy.)   Kay and Casada testified there was no discussion regarding any of these alternatives.   (E.g., Kay Dep. [DN 41-1] 45:15–:23, 59:18–65:24; see also Casada Dep. [DN 44-1] 28:18–29:7.)   Defendants do not argue that there were no less intrusive alternatives available to subdue or apprehend Harrison.   As Plaintiff notes, the only less-than-lethal alternatives that the officers had on hand were Tasers, which have a range of around 25 feet, and pepper spray.   Kay testified that the Crisis Response Team ("CRT")—members of which may have been on-duty at the BGPD station, three blocks away—is the only team authorized to use tear gas or beanbag rounds on a suspect, and that baton rounds were not available to patrol.   (See Kay Dep. [DN 44-1] 106–109.)   Kay further testified that there was no thought given to summoning the BGPD CRT because this was "a time critical situation," given that Harrison was "mobile, on foot" and "not barricaded" and the officers "didn't know if he was armed" and he "wasn't complying with [their] requests."   (Id. at 45:15–47:16.)   She also stated that the CRT has a checklist of what they are called out for, and "even if [the officers] requested them, that doesn't mean they're going to come."   (Id.)

Having considered the pertinent factors, the Court finds that the danger presented by Harrison was not so grave as to justify the use of deadly force.   See Smith v. Cupp, 430 F.3d 766, 773 (6th Cir. 2005).   Because a reasonable officer in Casada's position would not have probable cause to believe that Harrison posed an imminent threat of serious physical harm to the officers or to others at the time he was shot, the Court finds that Casada's use of deadly force was objectively unreasonable and therefore violated the Fourth Amendment.

### c.  Clearly Established Right

Defendants, in their Motion for Summary Judgment, assert that Casada is entitled to qualified immunity.   Plaintiff bears the burden to "show that the defendant is not entitled" to

qualified immunity, Untalan, 430 F.3d at 314 (quoting Blake v. Wright, 179 F.3d 1003, 1007 (6th Cir. 1999)), by showing that the right was clearly established at the time of the violation, Chappell, 585 F.3d at 907.

Thus, the next question is whether the right at issue was "clearly established" "in light of the specific context of the case" at the time of the events in question.  Scott, 550 U.S. at 377 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  The doctrine of qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson, 555 U.S. at 231 (quoting Harlow, 457 U.S. at 818).  A "clearly established" right is one whose contours are sufficiently clear such "that a reasonable official would understand that what he is doing violates that right."  Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  The requirement that the law be clearly established is designed to ensure that officers have "fair notice" of what conduct is proscribed.  See Hope v. Pelzer, 536 U.S. 730, 741 (2002); Brosseau, 543 U.S. at 198; United Pet Supply, Inc. v. City of Chattanooga, 768 F.3d 464, 485 (6th Cir. 2014).  The Supreme Court has repeatedly emphasized that the right must be "'clearly established' in a more particularized, and hence more relevant, sense," Anderson, 483 U.S. at 640, that is, "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" Brosseau, 543 U.S. at 198 (quoting Saucier, 533 U.S. at 201).  Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.

The Supreme Court has noted that "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but

it is to say that in the light of pre-existing law the unlawfulness must be apparent."  Anderson, 483 U.S. at 640 (internal citation omitted).  In inquiring whether a constitutional right is clearly established, this Court must look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within our circuit, and finally to decisions of other circuits. Sample v. Bailey, 409 F.3d 689, 698 (6th Cir. 2005) (quoting Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir. 1993)).  "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."  Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003) (citing Hope, 536 U.S. at 740–44).  "[I]n an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law."  Sample, 409 F.3d at 699 (quoting Brosseau, 543 U.S. at 199).  "[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional."  Cummings v. City of Akron, 418 F.3d 676, 687 (6th Cir. 2005) (quoting Hope, 536 U.S. at 741).  Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope, 536 U.S. at 741.

Plaintiff relies on King v. Taylor, 694 F.3d 650 (6th Cir. 2012), in which the Sixth Circuit stated "It has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'"  Id. at 664 (quoting Ciminillo v. Streicher, 434 F.3d 461, 468 (6th Cir. 2006)).  Indeed, the Sixth Circuit, relying on language from Tennessee v. Garner, has repeatedly stated that the right to be free from deadly force when not posing a serious threat of physical harm to officer or to others is clearly established.  See, e.g., Mullins, 805 F.3d at 765 (quoting Sample, 409 F.3d at 698) ("[I]t is

axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[] a threat of serious physical harm, either to the officer or to others . . . .'"); Margeson v. White Cnty., Tenn., 579 F. App'x 466, 471 (6th Cir. 2014); Bletz v. Gribble, 641 F.3d 743, 752 (6th Cir. 2011); Yates v. City of Cleveland, 941 F.2d 444, 447 (6th Cir. 1991).

Defendants argue that Casada is entitled to qualified immunity because he had probable cause to believe that Harrison posed a serious threat and therefore the use of deadly force was constitutionally permissible. Defendants do not argue that the right violated was not clearly established at the time of the events in question. Instead, Defendants' argument under the "qualified immunity" sub-heading is about whether a Fourth Amendment violation occurred in the first place.[14]

Having already concluded that Casada violated Harrison's Fourth Amendment rights, the Court turns to the question of whether the right in question—under the facts of this case as

---

[14] In their Memorandum in Support of their Motion for Summary Judgment, Defendants argument involves a discussion about the reasonableness of the officers' mistaken belief that Harrison was armed, on the stated assumption that "[t]he crux of Plaintiff's claim is that the officers were mistaken in the belief that Harrison was armed." (Defs.' Mem. Supp. Summ. J. [DN 61-1] 17.) Reasonable, but mistaken, beliefs such as this are pertinent to the question of whether an officer used more force than was necessary in a particular situation and thus whether an officer violated the Fourth Amendment or whether the use of force was justified. See Saucier, 533 U.S. at 205. They are not, however, pertinent to the question of whether an officer is entitled to qualified immunity. As the Supreme Court explained in Saucier:

> The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier, 533 U.S. at 205. Furthermore, Defendants do not proffer evidence that the officers believed that Harrison was armed; instead, the evidence demonstrates that the officers did not know whether or not Harrison was armed.

Defendants cite Pollard v. City of Columbus, Ohio, 780 F.3d 395 (6th Cir. 2015), for the proposition that "the Sixth Circuit recently ruled that an officer was entitled to qualified immunity where [the] dispatcher incorrectly reported that the suspect had a concealed carry permit because despite this mistake the officers conduct was reasonable when the suspect acted as though he had a gun." (Defs.' Mem. Supp. Summ. J. [DN 61-1] 17 (citing Pollard, 780 F.3d at 403); see also Defs.' Reply Supp. Summ. J. [DN 75] 6 (citing Pollard, 780 F.3d at 403).) However, the Sixth Circuit in Pollard reversed the district court's denial of qualified immunity because it found that there was no constitutional violation. Pollard, 780 F.3d at 403–04 ("Because the undisputed record shows the officers had probable cause for believing that Bynum posed a threat of serious harm, the use of deadly force was constitutionally permissible."). The Pollard court did not address the qualified immunity inquiry of whether the right allegedly violated was clearly established.

recited herein and as shown on the video—was clearly established, providing Casada with notice that "what he [was] doing violate[d] that right."   Clemente v. Vaslo, 679 F.3d 482, 490 (6th Cir. 2012) (quoting Anderson, 483 U.S. at 640).   Although there may be no case law directly dealing with these factual circumstances, this case is "governed by the rule that 'general statements of the law are capable of giving clear and fair warning to officers even where the very action in question has not previously been held unlawful.'"   Walker v. Davis, 649 F.3d 502, 504 (6th Cir. 2011) (quoting Smith, 430 F.3d at 776–77); see Jones v. Sandusky Cnty., Ohio, 541 F. App'x 653, 665–66 (6th Cir. 2013).   Here, the Court concluded that under the totality of the circumstances, there was not probable cause that Harrison posed an imminent threat of serious physical harm to the officers or to others, and thus that Casada violated Harrison's Fourth Amendment rights.   It is undisputed by the parties that the right asserted was a clearly established constitutional right at the time of the fatal shooting.   Accordingly, the Court finds that Casada is not entitled to qualified immunity.   Thus, the Court **GRANTS** Plaintiff's motion as to Casada on the § 1983 claim and **DENIES** Defendants' motion as to the same.

### 2.   § 1983 Claims against Kay

Plaintiff seems to assert § 1983 claims against Kay on theories of (i) failure to intervene and (ii) failure to supervise, based on the allegation that "Officers Kay and Casada inexplicably decided that if Mr. Harrison took 'one more step' he would be shot," (2d Am. Compl. [DN 84] ¶ 14).   Defendants argue that because it is undisputed that Casada is the officer who pulled the trigger and used force and that Kay did not use force, Plaintiff cannot argue that Kay has any liability for the use of force.   (Defs.' Resp. to Pl.'s Mot. Partial Summ. J. [DN 65] 5.)   However, the Sixth Circuit held in Bruner v. Dunaway, 684 F.2d 422 (6th Cir. 1982), that "it is not necessary, in order to hold a police officer liable under [§] 1983, to demonstrate that the officer

actively participated in striking a plaintiff." Id. at 426. In order to hold Sergeant Kay individually liable for the use of excessive force, Plaintiff must prove that she "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997). The first possibility is not relevant here.

The crux of Plaintiff's claims against Kay under § 1983 is the alleged mutual agreement between Kay and Casada that Harrison would be shot when he reached a certain point. Kay testified in her deposition that while she did not instruct Casada to shoot Harrison, "we came to an agreement that if he didn't – if he came past a certain point, we would [shoot him]. And it wasn't really like you're going to shoot or I'm going to shoot. It wasn't like that." (Kay Dep. [DN 41-1] 19:8–:13.) Kay further testified that the point that she came to an agreement with Casada about, that they would shoot Harrison if he moved beyond that point, was: "Out of our -- out of the spotlight that was mounted on the patrol vehicle, it has a pretty wide range that it illuminates. And he moved out of it once and I had to manually move it with my hand again to reilluminate him. And it was almost affixed to where it wouldn't turn any further." (Id. at 19:14–:22.) Defendants refute that Kay and Casada made an agreement to shoot, calling the allegation "grossly misleading." Defendants assert that Kay and Casada "made a tactical decision that if Harrison moved one step closer he became a reasonable threat to cause serious bodily harm or death to Casada, Kay, other Officers and anyone in that area." (Defs.' Reply Supp. Summ. J. [DN 75] 1–2.)

### a. Failure to Intervene

Police officers can be held liable for failure to protect a person from the use of excessive force by an officer. Turner, 119 F.3d at 429. "Generally speaking, a police officer who fails to

act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Turner, 119 F.3d at 429 (citing Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Anderson, 17 F.3d at 557 (citing O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d Cir. 1988)). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Id.

Although Plaintiff moves for summary judgment on liability against Kay, she does not appear to dedicate any of her motion to arguing that she is entitled to judgment as a matter of law as to Kay. Having not demonstrated that she is entitled to judgment as a matter of law on this claim, Plaintiff's motion for summary judgment is **DENIED** as to this claim.

In her Response to Defendants' Motion for Summary Judgment, Plaintiff, citing Durham v. Nu'Man, 97 F.3d 862, 868 (6th Cir. 1996), asserts that "Kay had more than enough time in this 12-minute encounter with Mr. Harrison to prevent his shooting." (Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 5–6.) Defendants respond that the instant case is "entirely distinguishable" from Durham, which involved a state hospital security officer who stood "idly by" during the beating of a shackled patient, because "Casada did not use excessive force. Therefore, Kay did not have reason to know that excessive force was being used." (Defs.' Reply Supp. Summ. J. [DN 75] 4.) As Defendants' argument solely is that Casada did not use excessive force and this Court has concluded that he did, the Court **DENIES** Defendants' motion for summary judgment on this claim.

**b. Failure to Supervise**

Similar to her claim against Kay for failure to intervene, Plaintiff does not appear to argue expressly that she is entitled to judgment as a matter of law on this claim. Plaintiff does assert that Kay "was a Sergeant in the Bowling Green police, was at least initially the officer-in-charge at the scene, and was the superior officer to Defendant Casada, who had only been on the force two years." (Pl.'s Mot. Partial Summ. J. [DN 60] 10 (citing Kay Dep. [DN 41-1] 6, 78, 130; Casada Dep. [DN 44-1] 11, 15–16).)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). "Nor can the liability of supervisors be based solely on the right to control employees, or 'simple awareness of employees' misconduct.'" McQueen v. Beecher Cmty. Schs., 433 F.3d 460, 470 (6th Cir. 2006) (citations omitted). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. Summers v. Leis, 368 F.3d 881, 888 (6th Cir. 2004); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999). Furthermore, "a supervisory official's failure to supervise, control[,] or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" McQueen, 433 F.3d at 470 (quoting Shehee, 199 F.3d at 300). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Combs v. Wilkinson, 315 F.3d 548, 558 (6th Cir. 2002) (quoting Hays v. Jefferson Cnty., Ky., 668 F.2d 869, 874 (6th Cir. 1982)).

Defendants contend that in this case, there is a lack of active conduct giving rise to any liability because the undisputed evidence is that Casada was not ordered to shoot and was not

otherwise instructed to shoot by any of the named individual Defendants.  Thus, Defendants contend, Plaintiff cannot prove supervisory liability.  Plaintiff responds only that "[b]y virtue of Kay's superior position to Casada and their mutual agreement to shoot Mr. Harrison, Kay is clearly liable for a failure to supervise her subordinate officer."  (Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 7.)

Kay's supervisory position does not automatically make her liable for the actions/inactions of her alleged subordinate Casada.  The Court finds that while no one ordered or otherwise instructed Casada to shoot, the alleged agreement between Kay and Casada creates a genuine dispute of material fact regarding whether Kay "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct" of Casada.  Accordingly, both Plaintiff's and Defendants' motions for summary judgment as to liability against Kay under § 1983 on a theory of failure to supervise are **DENIED**.

### 3.  § 1983 Conspiracy Claim Against Kay and Casada

Plaintiff claims that Defendants Kay and Casada conspired to violate Harrison's constitutional rights.  Plaintiff does not mention her conspiracy claim in her Motion for Partial Summary Judgment, thus the Court presumes that she does not move for summary judgment on that claim.

Defendants argue (1) that Plaintiff has failed to state a claim of conspiracy, (2) that even if Plaintiff has stated a claim of conspiracy, the claim is barred by the intra-corporate conspiracy doctrine because the named individuals were all employed by the City, and (3) that Defendants are entitled to summary judgment on that claim because "the record is wholly lacking of evidence to meet" the standard for civil conspiracy.  (Defs.' Mem. Supp. Summ. J. [DN 61-1] 18–19.)

The Sixth Circuit has recognized that conspiracy may serve as a theory of liability in claims advanced pursuant to § 1983.  See Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003).  The standard for proving a civil conspiracy claim in the Sixth Circuit is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is [1] that there was a single plan, [2] that the alleged coconspirator shared in the general conspiratorial objective, and [3] that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

Hensley v. Gassman, 693 F.3d 681, 695 (6th Cir. 2012) (quoting Hooks v. Hooks, 771 F.2d 935, 943–44 (6th Cir. 1985)).  "[C]onspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983."  Spadafore, 330 F.3d at 854.  Because "direct evidence of an express agreement among all the conspirators to conspire" is rare, "circumstantial evidence may provide adequate proof of conspiracy."  Id. (quoting Weberg v. Franks, 229 F.3d 514, 528 (6th Cir. 2000)).

Defendants argue that Plaintiff failed to state a claim for conspiracy because Plaintiff makes only a "cursory reference to a conspiracy in one time in Paragraph 11" of the Complaint and this "bare mention of conspiracy" is insufficient.  (Defs.' Mem. Supp. Summ. J. [DN 61-1] 18 (citing Gordon v. Louisville/Jefferson Cnty. Metro Gov't, 486 F. App'x 534, 541 n.5 (6th Cir. 2012)).)  In Gordon, the plaintiff made a single mention of conspiracy in his complaint, claiming that the defendant-officers "conspire[ed] together to violate Plaintiff's Constitutionally protected Civil Rights."  486 F. App'x at 541 n.5.  The Sixth Circuit found that the plaintiff's "bare mention of conspiracy" did not satisfy the requirement that a conspiracy claim must be pled with specificity.  Id.  Plaintiff contends that she sufficiently pled a claim of conspiracy because she

pled that "Officers Kay and Casada inexplicably decided that if Mr. Harrison took 'one more step' he would be shot," (2d Am. Compl. [DN 84] ¶ 14), which constitutes "an agreement between two or more persons to injure another by unlawful action," Hensley, 693 F.3d at 695. The Court finds that Plaintiff has stated a claim for civil conspiracy.

Defendants also argue that Plaintiff's conspiracy claim fails as a matter of law pursuant to the intracorporate conspiracy doctrine, which "provides that members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." DiLuzio v. Vill. of Yorkville, Ohio, 796 F.3d 604, 615 (6th Cir. 2015) (quoting Burgess v. Fischer, 735 F.3d 462, 483 (6th Cir. 2013)). The Court does not find that, under the controlling law, the intracorporate conspiracy doctrine bars Plaintiff's claim. The Sixth Circuit case Defendants cite in support on this issue is a § 1985 case, not a § 1983 case. See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ., 926 F.2d 505, 509 (6th Cir. 1991) (citing Doherty v. Am. Motors Corp., 728 F.2d 334, 339 (6th Cir. 1984)) (applying intracorporate conspiracy doctrine to conspiracy claim under 42 U.S.C. § 1985). There is a lack of controlling authority on the issue of the applicability of the intra-corporate conspiracy doctrine to § 1983 conspiracy claims, as "the Sixth Circuit has never held that the intracorporate conspiracy doctrine applies to municipal government officials in a § 1983 action." DiLuzio, 796 F.3d 604, 615 (6th Cir. 2015). The district courts within our circuit are split on this question. Compare Kinkus v. Vill. of Yorkville, 476 F. Supp. 2d 829, 839–41 (S.D. Ohio 2007) (intracorporate conspiracy doctrine did not apply to conspiracy claims brought under § 1983), rev'd on other grounds, 289 F. App'x 86, 90 n.4 (6th Cir. 2008), with Audio Visual Equip. & Supplies, Inc. v. Cnty. of Wayne, No. 06-10904, 2007 WL 4180974, at *6, 2007 U.S. Dist. LEXIS 86941, at *15 (E.D. Mich. Nov. 27, 2007) (applying intracorporate conspiracy doctrine to

conspiracy claims brought under § 1983); <u>Turner v. Viviano</u>, No. 04-CV-70509-DT, 2005 WL 1678895, at *13, 2005 U.S. Dist. LEXIS 35119 (E.D. Mich. July 15, 2005) (holding that intracorporate conspiracy doctrine barred plaintiff's § 1985 claim and, without discussion, stated "[l]ikewise, Plaintiff's claim against the city of a conspiracy under 42 U.S.C. § 1983 fails pursuant to the intracorporate conspiracy theory"). <u>See also</u> <u>Hopkins v. Canton City Bd. of Educ.</u>, No. 5:08 CV 2288, 2010 WL 2572830, at *10 n.8, 2010 U.S. Dist. LEXIS 63183 (N.D. Ohio June 23, 2010) ("Whether [the intracorporate conspiracy] doctrine extends beyond § 1985 to other types of conspiracy is questionable."), <u>aff'd</u>, 477 F. App'x 349 (6th Cir. 2012). Consequently, the Court is unpersuaded that Defendants are entitled to judgment as a matter of law on this point. <u>See</u> <u>Tinney v. Richland Cnty.</u>, No. 1:14 CV 703, 2015 WL 542415, at *12, 2015 U.S. Dist. LEXIS 16266 (N.D. Ohio Feb. 10, 2015).

Defendants argue that even if the Court were to consider the merits of Plaintiff's civil conspiracy claim, the Defendants are entitled to judgment as a matter of law. Defendants contend that the record is wholly lacking of evidence to support a civil conspiracy claim and that Kay and Casada did not make an agreement to injure Harrison by unlawful action. However, Plaintiff has presented evidence of the alleged agreement between Kay and Casada from which a jury to conclude that a conspiracy existed.

The Court finds that Plaintiff has stated a claim for civil conspiracy and has put forth evidence of such a conspiracy to avoid summary judgment. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on the conspiracy claim.

### 4.  § 1983 Supervisory Liability Claim against Hawkins

Plaintiff asserts a § 1983 claim of personal supervisory liability for a failure to train and supervise against Chief Hawkins. Defendants argue first that, because "a prerequisite of

supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor," McQueen, 433 F.3d at 470, and Plaintiff failed to prove any constitutional violation by Casada, this claim fails.  However, given that the Court has found a constitutional violation by Casada, Defendants' initial argument fails.

Second, Defendants argue that there is a lack of active conduct giving rise to any liability.[15]  Because § 1983 liability cannot be imposed under a theory of *respondeat superior*, supervisory "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'"  Shehee, 199 F.3d at 300 (quoting Salehpour v. Univ. of Tenn., 159 F.3d 199, 206 (6th Cir. 1998), cert. denied, 526 U.S. 1115 (1999)).  "Liability under this theory must be based upon more than a mere right to control employees and cannot be based upon simple negligence."  Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999) (citing Leach v. Shelby Cnty. Sheriff, 891 F.2d 1241, 1246 (6th Cir. 1989)).  Chief Hawkins can be held liable in his individual capacity for a failure to train and supervise only if he "either encouraged the specific incident of misconduct or in some other way directly participated in it."  Shehee, 199 F.3d at 300.  To hold Hawkins liable, Plaintiff, at a minimum, must show that Hawkins "at least implicitly authorized, approved, or knowingly acquiesced" in Casada's shooting of Harrison.  Id.

Here, Plaintiff has not alleged nor presented any evidence to support a finding of Hawkins' personal involvement in the shooting.  "The attempt to hold [Hawkins] liable in [his] individual capacity[y] for [his] alleged failure to adequately train employees in [Casada]'s position 'improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.'"  Harvey v. Campbell Cnty., Tenn., 453 F. App'x 557, 563 (6th Cir. 2011)

---

[15] Plaintiff's Response addresses together Defendants Hawkins and the City of Bowling Green's liability for failure to train and supervise.  However, "[a] § 1983 claim of personal liability for a failure to train and supervise differs from a § 1983 claim against a municipality for a failure to train and supervise."  Coley v. Lucas Cnty., Ohio, 799 F.3d 530, 541 (6th Cir. 2015).

(quoting Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 543 (6th Cir. 2008)); see also Miller v. Calhoun Cnty., 408 F.3d 803, 817 n.3 (6th Cir. 2005) (absent evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed brought against them in their official capacities, to be treated as claims against the county).  To the extent Plaintiff has adduced evidence supporting findings that Hawkins was a City policymaker on matters of training and was so deliberately indifferent to the need for more comprehensive training as to render the training deficiency a matter of *de facto* City policy, he would be liable, if at all, in his *official* capacity, *i.e.*, rendering the City liable.  See Harvey, 453 F. App'x at 563 (citing Scott v. Clay Cnty., Tenn., 205 F.3d 867, 879 n.21 (6th Cir. 2000)).  Accordingly, the Court **GRANTS** summary judgment in favor of Defendants as to Plaintiff's claim against Hawkins for supervisory liability under § 1983.

### 5.  § 1983 Official Capacity Claims

As to the official capacity claims against Chief Hawkins, Sergeant Kay, and Officer Casada, the Sixth Circuit has held that a suit against an individual "in his official capacity" is essentially a suit brought directly against the local government unit.  Leach, 891 F.2d at 1245; see Kentucky v. Graham, 473 U.S. 159, 165–66 (1985).  "If an action is brought against an official of a governmental entity in his official capacity, the suit should be construed as brought against the governmental entity."  Isom v. Ramsey, No. CIV A 3:07-CV-431-H, 2008 WL 2079408, at *2, 2008 U.S. Dist. LEXIS 39640 (W.D. Ky. May 15, 2008) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  The Court will therefore construe the official-capacity claims against Hawkins, Kay, and Casada as brought against the City of Bowling Green.  See Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994).

### 6.   § 1983 Municipal Liability Claims against City of Bowling Green

Plaintiff contends that the violation of Harrison's constitutional rights resulted from the failure of the Defendants City of Bowling Green, Hawkins, and Kay "to: (a) employ qualified persons for positions of authority; and/or (b) to properly or conscientiously train and supervise the conduct of such persons after their employment; and/or (c) to promulgate appropriate operating policies and procedures either formally or by custom to protect the Constitutional rights of Gregory Harrison."  (2d Am. Compl. [DN 84] ¶ 11.)

Defendants seek summary judgment on Plaintiff's municipal liability claim.  Under § 1983, a municipality can be held liable only if the plaintiff demonstrates that the injury suffered was a direct result of the municipality's official policy or custom.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Id.; Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'"  City of St. Louis v. Praprotnik, 485 U.S. 112, 138 (1988) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80 (1986)). To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy."  Alkire v. Irving, 330 F.3d 802, 815 (6th Cir. 2003).  The causal link must be strong enough to support a finding that the defendant's deliberate conduct can be deemed the "moving force" behind the violation.  Graham v. Cnty. Of Washtenaw, 358 F.3d

377, 383 (6th Cir. 2004) (quoting Waters v. City of Morristown, 242 F.3d 353, 362 (6th Cir. 2001)).

A plaintiff can make a showing of an official policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir.) (quoting Burgess, 735 F.3d at 478), cert. denied, 135 S. Ct. 758 (2014).  Plaintiff attempts to establish her Monell claim in two of the four ways.

### a.  Failure to Hire

In her complaint, Plaintiff alleges that the conduct at issue in this case resulted from, *inter alia*, a failure to hire qualified persons for positions of authority.  (See 2d Am. Compl. [DN 84] ¶ 11.)  Defendants contend that Plaintiff has not presented any evidence to show any deficiencies regarding the hiring of Casada.  Plaintiff does not address a failure to hire claim in her Response. In a footnote in their Reply, Defendants state that "Plaintiff does not address a failure to hire claim.  Therefore Defendants presume Plaintiff abandons any such claim and or acknowledges there is no support for such a claim herein."  (Defs.' Reply Supp. Mot. Summ. J. [DN 75] 3 n.3.) The Court, seeing no argument or support for such a claim, dismisses any such claim.

### b.  Failure to Train and Supervise

Plaintiff alleges that the City is liable under ¶ 1983 for failing to adequately train Officer Casada and Sergeant Kay.  (2d Am. Compl. [DN 84] ¶ 11.)  The Supreme Court has held that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into

contact.  City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).  "A municipality's culpability

for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

Connick v. Thompson, 563 U.S. 51, 61 (2011).  After all, "[i]n virtually every instance where a

person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will

be able to point to something the city could have done to prevent the unfortunate incident."  Id. at

67 (quoting City of Canton, 489 U.S. at 392).  The Court in City of Canton ruled that a plaintiff

must identify a particular deficiency in the training program and prove that the identified

deficiency was the actual cause of the plaintiff's constitutional injury.  City of Canton, 489 at

390–91.  The Court noted:

> That a particular officer may be unsatisfactorily trained will not alone suffice to
> fasten liability on the city, for the officer's shortcomings may have resulted from
> factors other than a faulty training program.  It may be, for example, that an
> otherwise sound program has occasionally been negligently administered.
> Neither will it suffice to prove that an injury or accident could have been avoided
> if an officer had had better or more training, sufficient to equip him to avoid the
> particular injury-causing conduct.  Such a claim could be made about almost any
> encounter resulting in injury, yet not condemn the adequacy of the program to
> enable officers to respond properly to the usual and recurring situations with
> which they must deal.  And plainly, adequately trained officers occasionally make
> mistakes; the fact that they do says little about the training program or the legal
> basis for holding the city liable.

City of Canton, 489 U.S. at 390–91(internal citations omitted).  In order to establish a failure-to-

train claim in the Sixth Circuit, a plaintiff must prove: "1) the City's training program was

inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's

deliberate indifference; and 3) the inadequacy was closely related to or actually caused the

injury."  Ciminillo, 434 F.3d at 469 (citing Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th

Cir. 1992)); see City of Canton, 489 U.S. at 390.

First, Plaintiff must offer evidence of a particular deficiency in the City's training

program.  Plaintiff argues that the "circumstances of this case" evidence "little to no training

dealing with persons like Mr. Harrison or in the appropriate use of force." (Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 8.)  Plaintiff offers her police practices expert's opinion that the incident involving Harrison "reflected a complete lack of effective, appropriate, or meaningful training." Although not entirely clear, it appears that Plaintiff is asserting two deficiencies of BGPD training.  First, Plaintiff contends that BGPD does not have a policy for dealing with persons with diminished capacity like Harrison.  However, as Plaintiff notes, with failure-to-train liability "it is the substance of the training, not the existence of it or even a written policy, that controls." (Id. at 7–8.)  And, as discussed below, Defendants offer evidence of Casada and Kay's training regarding dealing with individuals with psychological conditions and mentally ill subjects. Second, Plaintiff speculates that Kay and Casada's alleged flagrant violation of BGPD's use-of-force policy "may have been, at least in part, the result of the fact that Kay and Casada had no access to or training in the use of non-lethal force alternatives like beanbags or baton rounds that could have brought the encounter with Mr. Harrison to a non-lethal conclusion."  (Id. at 8 (citing Kay Dep. [DN 41-1] 106–08).)  But it does not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."  City of Canton, 489 U.S. at 391.

Defendants offer the BGPD Policy and Procedure Manual, which includes a use-of-force policy, and contend that the City had policies in place addressing the proper use of force and the training of its employees on that policy.  Under the Policy and Procedure Manual, "[a]ll newly hired police personnel are provided instruction in the law regarding the use of force while attending recruit training at the Department of Criminal Justice Training," and "[a]s part of the Department's Training Program, all newly hired police personnel are issued copies of and provided with instruction in Department policy and procedures regarding the use of force prior to

being allowed to carry a firearm, baton, [pepper spray] canister, or Taser." (BGPD Policy and Procedure Manual, Kay Dep. Ex. 4 [DN 41-1] 3.1.7.9 Instruction in the Use of Force; see id. at 3.1.6 Use of Force Policy; id. at 3.1.7.3 Use of Firearms; id. at 3.1.9 Firearms Provisions and Qualifications.) Casada testified that he received training on the use of firearms, the use of force, and people with psychological conditions at the Department of Criminal Justice Training, (see Casada Dep. [DN 44-1] 49:4–:21), and that he received yearly in-house training, which included scenario-based training, yearly training on the use of force and firearm qualification, and yearly training on a FireArms Training Simulator (shoot-don't shoot, use a Taser-don't use a Taser) machine from the BGPD, (see id. at 49:22–50:8).

Defendants also assert that Sergeant Kay, who was attempting communication with Harrison, was properly trained in negotiation and crisis intervention ("CIT" or "crisis intervention training"). Kay testified that she has been through seven in-house annual trainings (officers "train with – rounds on how to approach different situations"), a 40-hour class of CIT, which "specializes in mentally ill subjects and how to recognize [them]," in 2007 or 2008, and a 40-hour hostage negotiation basic level class in 2009 or 2010. (Kay Dep. [DN 41-1] 100:3–104:20.) Kay further testified that she drew on her CIT and hostage negotiation training when first communicating with Harrison. When he refused to follow her orders, she went to her policing skills, although the tactic of switching to trying to get him to sit down was from principles she learned in either CIT or hostage negotiation. (Id. at 166:21–167:24.) Plaintiff asserts that Kay's "panicked" and "anxious" behavior at the scene "reflected no 'Crisis Intervention Training,' much less common sense." (Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 8.) However, "adequately trained officers occasionally make mistakes, the fact that they do says

little about the training program or the legal basis for holding the city liable." City of Canton, 489 U.S. at 390.

Plaintiff also contends that "it is the substance of the training, not the existence of it or even a written policy, that controls." (Pl.'s Resp. to Defs.' Mot. Summ. J. [DN 63] 7–8.) Indeed, the Supreme Court has recognized that "failure-to-train liability is concerned with the substance of the training, not the particular instructional format," Connick, 563 U.S. at 68, and the Sixth Circuit in Russo, 953 F.2d 1036, rejected a rule "that a municipality may shield itself from liability for failure to train its police officers in a given area simply by offering a course nominally covering the subject, regardless of how substandard the content and quality of that training is," id. at 1047. However, Plaintiff does not contend, or offer evidence, that the City's training program was substantively inadequate. The only evidence Plaintiff offers is her expert's opinion that the incident involving Harrison "reflected a complete lack of effective, appropriate, or meaningful training." Of course, Plaintiff, "in response to a properly supported motion for summary judgment, cannot rely merely on allegations and arguments, but must set out specific facts showing a genuine issue for trial." Harvey, 453 F. App'x at 565 (citing Leary, 528 F.3d at 444).

While Plaintiff may have shown a genuine issue of fact with respect to the inadequacy-of-training prong of City v. Canton, she offers no evidence that any inadequacy, if indeed one existed, was the result of the City's deliberate indifference. See Harvey, 453 F. App'x at 567. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 410 (1997). There are two ways a plaintiff can prove deliberate indifference for failure to train. Proving deliberate indifference for failure to train

"typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." Miller v. Calhoun Cnty., 408 F.3d 803, 815 (6th Cir. 2005); Connick, 563 U.S. at 62 (quoting Brown, 520 U.S. at 407). "Where, as here, the constitutional violation was not alleged to be part of a pattern of past misconduct, a supervisory official or a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable." Hays v. Jefferson Cnty., Ky., 668 F.2d 869, 874 (6th Cir. 1982); Harvey, 453 F. App'x at 567. This second mode of proof is available "in a narrow range of circumstances" where a federal rights violation "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Brown, 520 U.S. at 409. The Supreme Court posed the hypothetical example of a municipality that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. City of Canton, 489 U.S. at 390 n.10. "Given the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,' the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights." Connick, 563 U.S. at 63–64 (quoting Brown, 520 U.S. at 409 (discussing City of Canton, 489 U.S. at 390 n.10)).

Here, however, unlike in the City of Canton hypothetical, it is undisputed that the City trained its police officers on the use of deadly force and that Casada and Kay received training in the use of deadly force and in dealing with mentally ill subjects. Plaintiff having put forth no

evidence that the City was deliberately indifferent, the Court **GRANTS** summary judgment in favor of Defendants.

### c. Ratification

Plaintiff also argues that the City of Bowling Green and Chief Hawkins, in his official capacity, ratified Kay and Casada's decision to shoot Harrison when the City and Hawkins initiated an investigation into the shooting but took no action in response to Harrison's death. (Pl. Resp. to Defs.' Mot. Summ. J. [DN 63] 9.)  Plaintiff relies on St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988), Meyers v. City of Cincinnati, 14 F.3d 1115, 1118–19 (6th Cir. 1994), and Arendale v. City of Memphis, 519 F.3d 587, 602 (6th Cir. 2008).

The cases relied on by Plaintiff do not support a theory of municipal liability in this case. As Defendants note, those cases involve employment-related claims and are thus distinguishable. For example, in Arendale, the plaintiff was suspended from duty and that suspension was sustained by the police chief.  The Arendale court found that the municipality could be held liable under § 1983 for the final disciplinary decision of the chief, who had final policy making authority with respect to the plaintiff's disciplinary charge.  519 F.3d at 601–02; see Meyers, 14 F.3d at 1118–19 (final policy making authority, by issuing final determination affirming unconstitutional acts of the City Manager, actively participated in the constitutional violation of employee's rights of free speech); see also Peabody v. Perry Twp., Ohio, No. 2:10-CV-1078, 2013 WL 1327026, at *12–13, 2013 U.S. Dist. LEXIS 46344 (S.D. Ohio Mar. 29, 2013) (discussing different theories of ratification); Feliciano v. City of Cleveland, 988 F.2d 649, 656 (6th Cir. 1993).

However, the Sixth Circuit has found that a municipality may be liable based on a ratification theory by failing to meaningfully investigate its employees' allegedly

unconstitutional acts.   See Leach v. Shelby County Sheriff, 891 F.2d 1241 (6th Cir. 1989);

Marchese v. Lucas, 758 F.2d 181 (6th Cir. 1985); see also Wright v. City of Canton, Ohio, 138

F. Supp. 2d 955, 966 (N.D. Ohio 2001).   In Marchese, a county sheriff failed to investigate his

deputies' beating of an inmate who earlier threatened a deputy's life.   The court found that the

sheriff's failure to investigate constituted ratification of his deputies' unconstitutional acts.   And

because the sheriff acted as the county's final policymaker with regard to law enforcement

matters, the court considered this ratification as municipal policy for purposes of § 1983.

Marchese, 758 F.2d at 188.   Similarly, in Leach, a county sheriff did not investigate his

employees' failure to provide for the medical needs of a paraplegic inmate.   The court relied on

Marchese and imposed liability on the municipality.   Leach, 891 F.2d at 1248 ("Thus, like

Marchese, the Sheriff here ratified the unconstitutional acts.   In Marchese, such ratification was

deemed sufficient to attach liability to the sheriff and the County.   We find it equally sufficient in

this context.").

Based on Marchese and Leach, Plaintiff can establish her municipal liability claim by

showing (1) that a final municipal policymaker approved an investigation into the shooting of

Harrison by Officer Casada and (2) the investigation was so inadequate as to constitute a

ratification of Casada's alleged use of excessive force.   Wright, 138 F. Supp. 2d at 966.   Plaintiff

does not offer sufficient evidence to make this showing.   Unlike the government officials in

Marchese and Leach, there was an investigation into the shooting of Harrison by Officer Casada

conducted by the Kentucky State Police ("KSP").   "In cases where an investigation has been

conducted, courts have been reluctant to impose municipal liability based on a ratification

theory."   Daniels v. City of Columbus, No. C2-00-562, 2002 WL 484622, at *6, 2002 U.S. Dist.

LEXIS 28130 (S.D. Ohio Feb. 20, 2002) (citing Anthony v. Vaccaro, 43 F. Supp. 2d 843, 848

(N.D. Ohio 1999) (no municipal liability based on ratification theory where government officials conducted investigation of alleged misconduct) and Walker v. Norris, 917 F.2d 1449, 1457 (6th Cir. 1990) (distinguishing Marchese)).   Plaintiff may not agree with the outcome of the investigation, but it is undisputed that an investigation was conducted.   See id.   Plaintiff has failed to show that the KSP investigation was so inadequate as to constitute a ratification of Casada's alleged use of excessive force.   Accordingly, the Court **GRANTS** summary judgment in favor of Defendants as to Plaintiff's ratification theory of municipal liability under § 1983.[16] All § 1983 claims against the City thus fail.

### C.   State-Law Claims

Plaintiff also has also asserted a variety of state law claims.   Plaintiff brings claims against all Defendants for negligence and gross negligence (Count II), IIED (Count V), and wrongful death (Count VI), a claim against Casada for battery (Count IV), and a claim to hold Hawkins and the City of Bowling Green vicariously liable for the torts of Kay and Casada (Count III).   Defendants argue they are entitled to qualified official immunity regarding the state law claims brought against them in their individual capacities.

### 1.   Qualified Official Immunity

Under Kentucky law, an officer or employee of a government agency sued in his or her individual capacity enjoys "qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment."   Yanero v. Davis, 65 S.W.3d 510, 522 (Ky. 2001) (citing 63C Am. Jur. 2d, Public Officers and Employees, § 309 (1997)).   "Qualified official immunity applies to the negligent performance by a public

---

[16] To the extent that Plaintiff is asserting that Chief Hawkins has § 1983 supervisory liability under a ratification theory, summary judgment is appropriate as well.   See Walker v. Norris, 917 F.2d 1449, 1457 (6th Cir. 1990) (distinguishing Marchese, where the county sheriff was sued in his official capacity, and affirming entry of a directed verdict for defendants on the plaintiff's ratification theory of supervisory liability).

officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." Id. (citations omitted). "Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.,* one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." Id. "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." Id. at 523 (citing Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir. 1991), as modified by Cox v. Ky. Dep't of Transp., 53 F.3d 146 (6th Cir. 1995)).

### 2. Officer Casada

### a. Qualified Official Immunity

Defendants contend that Casada is entitled to qualified official immunity. Assuming that Defendants had shown *prima facie* that the shooting of Harrison was performed within the scope of Casada's discretionary authority as a police officer, see Nichols v. Bourbon Cnty. Sheriff's Dep't, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (determination of the amount of force required to effect an arrest is a discretionary act within the scope of school safety officer's authority); Woosley v. City of Paris, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008), as amended (Dec. 4, 2008) (police officer's use of force was clearly discretionary acts within the scope of his authority as a police officer), the burden shifts to Plaintiff to establish that the discretionary act was not performed in good faith, Yanero, 65 S.W.3d at 523.

The Kentucky Supreme Court in Yanero stated that "in the context of qualified official immunity, 'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness." 65 S.W.3d at 523.  Thus, "in effect, this inquiry tracks the inquiry for objective reasonableness and qualified immunity" discussed *supra* in Part III.B.1.  See Turner v. Hill, No. 5:12-CV-00195-TBR, 2014 WL 549462, at *9, 2014 U.S. Dist. LEXIS 16669 (W.D. Ky. Feb. 11, 2014). As the Court has found that Casada violated Harrison's clearly established constitutional rights, the Court concludes that Casada is not entitled to qualified official immunity.  See Turner, 2014 WL 549462, at *9.

### b. Battery

Plaintiff asserts that Casada committed the tort of battery.  (2d Am. Compl. [DN 84] Count IV.)  Under Kentucky law, a battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him."  Vitale v. Henchey, 24 S.W.3d 651, 657 (Ky. 2000) (quoting Sigler v. Ralph, 417 S.W.2d 239, 241 (Ky. 1967)). "The use of excessive force by a police officer constitutes the intentional tort of battery."  Ali v. City of Louisville, No. 3:03CV-427-R, 2006 WL 2663018, at *8, 2006 U.S. Dist. LEXIS 66426 (W.D. Ky. Sept. 15, 2006).

Plaintiff states that "a police officer is also liable for battery where, as here, he uses more force than is necessary in effecting an otherwise justified arrest."  (Pl.'s Mot. Partial Summ. J. [DN 60] 8 (citing City of Lexington v. Gray, 499 S.W.2d 72, 75 (Ky. 1973).)[17]  A police officer is privileged to use the amount of force that the officer reasonably believes is necessary to make

---

[17] There is no other mention of the battery claim in Plaintiff's Motion for Partial Summary Judgment.

an arrest, but no more.   See Gray, 499 S.W.2d at 74 (citing KRS 431.025(3) (prohibiting unnecessary force in making an arrest and impliedly permitting necessary force)).

Defendants' argument for summary judgment on the battery claim tracks their § 1983 argument; Defendants contend that Harrison's statement to dispatch that he had a gun and wanted to kill his brother, his statement "mom, forgive me for what I am about to do," coupled with his actions presented what reasonably appeared to be an immediate threat of serious death or bodily injury to Casada and others.   (Defs.' Mem. Supp. Summ. J. [DN 61] 31–32.) Defendants quote Fultz v. Whittaker, 261 F. Supp. 2d 767 (W.D. Ky. 2003), in which Judge Heyburn found that, although KRS 503.050 (justification for use of physical force in self-protection) and KRS 503.090 (justification for use of physical force in law enforcement) are justifications in defense of criminal charges for use of physical force, "the same principles appl[ied]" to the plaintiff's state law claim of civil assault and battery against defendant-officers. Id. at 783.   Thus, Defendants argue that summary judgment is warranted because Casada's use of force was privileged and was justified based upon the perceived threat that Harrison presented.

The Court finds that neither party is entitled to summary judgment on the battery claim against Casada.   Although the Court found that Casada's use of force was unreasonable under the Fourth Amendment, "[t]he state standard of course need not be identical to the federal standard." Coitrone v. Murray, No. 15-5575, 2016 WL 683243, at *8, 2016 U.S. App. LEXIS 2959 (6th Cir. Feb. 19, 2016) ("the analysis of excessive force claims under § 1983 is different from the analysis under state law" (quoting Ali, 2006 WL 2663018, at *8)).   A defendant's use of deadly force is privileged "when the defendant believes that such force is necessary to protect himself against death [or] serious physical injury."   KRS 503.050(2).   A jury could find that Casada believed that the force used was necessary to protect himself and thus that Casada was privileged

to use the force he did, as a defense to Plaintiff's battery claim.  Accordingly, the Court **DENIES** both Plaintiff's and Defendants' motions for summary judgment on this claim.

### c.  Negligence/Gross Negligence

Plaintiff asserts a claim that Casada was negligent and/or grossly negligent in his use of force.  (See 2d Am. Compl. [DN 84] Count II.)  Defendants contend, citing Turner v. Hill, 2014 WL 549462, at *10, that because Plaintiff has asserted a separate claim of battery against Casada, the Court should grant summary judgment in favor of Defendants on Plaintiff's negligence and gross negligence claims against Casada.

As this Court explained in Ali, and again in Turner, when an officer uses excessive force, he can be liable for the intentional tort of battery, but he cannot be liable for negligence.  Ali, 2006 WL 2663018, at *8; see Turner, 2014 WL 549462, at *10.

> There is no such thing as a negligent battery.  Where the officer may have mistakenly believed that he needed to use the amount of force that he did, that does not change the fact that initial action was intentional, or alter the objective analysis of whether the force he ultimately used was excessive.  Thus, where an unwanted touching (a battery), which is inherent in any arrest, escalates beyond that which is reasonably necessary into excessive force, the cause of action is solely for battery, with the officer's privileged use of force ending when the excessive force began.  To permit a separate claim for negligence creates the risk that a jury would assume that, even if no excessive force were used, the officer might somehow still be liable for some undefined negligence.  Such a result is doctrinally unsupportable and unacceptable, because each time an officer uses force, he commits an intentional act of battery for which he is liable, unless he is clothed by a privilege permitting him to use a reasonable amount of force (e.g., that articulated in Gray, 499 S.W.2d at 74 (interpreting KRS 431.025(3)), or KRS 503.050, 503.070, 503.090).

Ali, 2006 WL 2663018, at *8 (citation omitted).  Accordingly, Plaintiff's negligence and gross negligence claims against Officer Casada in his individual capacity fail as a matter of law.  See Durmov v. Univ. of Ky., No. CIV. 5:12-258, 2013 WL 488976, at *2, 2013 U.S. Dist. LEXIS 16615 (E.D. Ky. Feb. 7, 2013).  The Court thus **DENIES** Plaintiff's motion as to this claim and **GRANTS** summary judgment in favor of Defendants as to this claim.

**d.  Intentional Infliction of Emotional Distress**

Plaintiff asserts a claim for outrage under Kentucky law against Casada.  In Kentucky, this tort is also known as intentional infliction of emotional distress ("IIED").  See Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 788 (Ky. 2004), overruled on other grounds by Toler v. Sud-Chemie, Inc., 458 S.W.3d 276 (Ky. 2015).  In Kentucky, to prevail on an outrage claim, a plaintiff must show that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was so outrageous or intolerable that it offends against the generally accepted standards of decency and morality; (3) there is a causal connection between the conduct and the plaintiff's emotional distress; and (4) the emotional distress suffered is severe.  See Gilbert v. Barkes, 987 S.W.2d 772, 777 (Ky. 1999); Kroger Co. v. Willgruber, 920 S.W.2d 61, 65 (Ky. 1996).

Under Kentucky law, IIED is a "gap-filler" tort, "providing redress for extreme emotional distress where traditional common law actions do not."  Banks v. Fritsch, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001); Rigazio v. Archdiocese of Louisville, 853 S.W.2d 295, 289–99 (Ky. Ct. App. 1993).  "[W]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie."  Rigazio, 853 S.W.2d at 299; see also Childers v. Geile, 367 S.W.3d 576, 582 (Ky. 2012) (same).  This is because "[t]here can be only one recovery for emotional distress on the same acts.  It will either be caused as a result of an injury done to the plaintiff physically"—where a separate IIED claim is not available—"or it will be caused by outrageous conduct the purpose of which is to inflict emotional distress"—where IIED is available.  Childers, 367 S.W.3d at 583.  "The only exception is where one can say that Defendant's physical assault was intended solely to inflict extreme emotional distress."  Doe v. Suroor, No.

3:05–CV–728–H, 2007 WL 1651993, at *1, 2007 U.S. Dist. LEXIS 41343 (W.D. Ky. June 6, 2007); see Brewer v. Hillard, 15 S.W.3d 1, 7–8 (Ky. Ct. App. 2000).

Here, Casada's conduct was properly the subject of a battery (traditional tort) claim for which recovery of emotional distress is permitted, and Plaintiff has not presented any evidence from which a jury could infer that Casada's actions were intended only to cause Harrison extreme emotional distress. Therefore, summary judgment in favor of Defendants on Plaintiff's IIED claim as to Casada is proper. See Rigazio, 853 S.W.2d at 299; Walker v. City of Lebanon, Ky., No. 3:12-CV-855-H, 2013 WL 6185402, at *9, 2013 U.S. Dist. LEXIS 166851 (W.D. Ky. Nov. 25, 2013). Defendants' motion for summary judgment is **GRANTED** on this claim as to Casada.[18]

### 3. Other Individual Defendants (Kay and Hawkins)

Defendants contend that the other named individual Defendants, to the extent that Plaintiff attempts to impose liability upon them based on their supervisory responsibility, are also entitled to qualified official immunity. Defendants cite Cole v. Shadoan, 782 F. Supp. 2d 428, 435–36 (E.D. Ky. 2011), for the proposition that, in general, the supervision of employees is an inherently discretionary act to which qualified official immunity applies. Defendants then argue that because Plaintiff cannot show that Defendants Hawkins and Kay did not act in good faith based on the evidence in the record, the defense of qualified official immunity precludes the supervisory claims against Hawkins and Kay and the Court should grant summary judgment on Plaintiff's state-law claims against them.

Plaintiff counters, relying on Yanero, that while the *promulgation* of a policy is discretionary, an established policy must be enforced and followed, and there is no official qualified immunity for the failure to do either. Plaintiff appears to argue that Hawkins and Kay

---

[18] Plaintiff does not move for summary judgment on this claim.

negligently failed to enforce federal law, state law, and the BGPD use-of-force policy "that clearly prohibited the shooting." (Pl.'s Resp. [DN 63] 14.) Plaintiff argues that because Defendants Kay and Hawkins' duties to Harrison were ministerial and not discretionary, Defendants are not entitled to the defense of qualified official immunity.

Defendants reply that the use of force, supervision and training, see Nichols, 26 F. Supp. 3d at 642 (citing Rowan Cnty. v. Sloas, 201 S.W.3d 469, 480 (Ky. 2006); Doe v. Magoffin Cnty. Fiscal Ct., 174 F. App'x 962, 973 (6th Cir. 2006)) ("Supervision and training are discretionary functions."), promulgation of rules and policies, and enforcement of such policies are all discretionary functions. Defendant, relying on Walker v. Davis, 643 F. Supp. 2d 921, 933 (W.D. Ky. 2009), aff'd, 649 F.3d 502 (6th Cir. 2011), contends that the enforcement of a policy only is ministerial where there is a specific policy or mandate as to the manner in which enforcement must occur. In Walker, this Court granted immunity to a county sheriff on the ground that the plaintiff failed to point to any policy that required the sheriff to supervise the enforcement of a police pursuit policy in any particular manner. 643 F. Supp. 2d at 933–34. Likewise, here, Defendants contend, and the Court agrees, that Plaintiff has failed to identify a policy that required Hawkins or Kay to supervise the enforcement of the use-of-force policy in any particular manner. Under such circumstances, the manner in which they enforce and supervise the use-of-force policy is discretionary in nature. See Walker, 643 F. Supp. 2d at 934.

Plaintiff contends, citing Hill v. Adkins, 59 F. Supp. 3d 814 (E.D. Ky. 2014), that good faith, the opposite of bad faith, that can void qualified official immunity, is a question of fact; therefore summary judgment is not appropriate. However, summary judgment should only be denied where a plaintiff presents evidence demonstrating that a genuine dispute of fact exists. The case relied upon by Plaintiff found that there were factual disputes that bore directly on the

issue of whether the defendant officer acted in good faith.  See id. at 819–20.  Plaintiff has not presented evidence that Hawkins and Kay did not act in good faith, as is her burden to do, see Yanero, 65 S.W.3d at 523.

Accordingly, Hawkins and Kay are entitled to qualified official immunity for Plaintiff's claim for negligent enforcement of the use-of-force policy and thus the Court **GRANTS** summary judgment in favor of Defendants on that claim.

### 4.  Intentional Infliction of Emotional Distress

Plaintiff asserts a claim for IIED under Kentucky law against all Defendants in this action.[19]  In their motion, Defendants argue only that Plaintiff's separate battery claim precludes her IIED claim.  However, Plaintiff voluntarily dismissed the battery claim as to all Defendants except Casada in her response.  Plaintiff argues that until it is determined whether the facts of this case constitute battery, negligence/gross negligence, or neither, she should not be foreclosed from pursuing her IIED claim against all Defendants.  As previously noted, Plaintiff's IIED claim against Defendant Casada fails as a matter of law.  Defendants reply that they are entitled to judgment as to Plaintiff's IIED claim because when claims for battery and negligence have been raised, a claim for IIED only lies where the plaintiff proves that the "actions were intended only to cause him extreme emotional distress, rather than to merely touch or to deprive him of his liberty" Banks, 39 S.W.3d at 481, and Plaintiff has presented no evidence that Defendants intended to cause emotional distress to Harrison.  The Court finds that Defendants are entitled to judgment as to Plaintiff's IIED claim and **GRANTS** Defendants' motion as to this claim.

---

[19] As previously noted, Plaintiff's claim for outrage against Defendant Casada fails as a matter of law.

### 5.  Wrongful Death

Defendants argue that because Plaintiff failed to prove any tort claim against Defendants, summary judgment on Plaintiff's wrongful death claim is warranted.  As there are still tort claims remaining, the Court **DENIES** Defendants' motion as to the wrongful death claim.

### 6.  Vicarious Liability

In Count III, Plaintiff alleges that Defendants City of Bowling Green and Chief Hawkins are vicariously liable for the state-law torts of Kay and Casada.  Defendants argue that because a necessary prerequisite to establishing vicarious liability is for Plaintiff to prove her underlying tort claims against the tortfeasor-employees, Haugh v. City of Louisville, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007) ("vicarious liability is not possible without primary liability"), and Plaintiff has failed to prove such claims, the Court should grant summary judgment on her vicarious liability claim.  Having determined that the battery claim against Casada may proceed to trial, summary judgment as to this vicarious liability claim is not appropriate.  Accordingly, the Court **DENIES** Defendants' motion as to the vicarious liability claim.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment [DN 60] is **GRANTED in part** and **DENIED in part** and Defendants' Motion for Summary Judgment [DN 61] is **GRANTED in part** and **DENIED in part**.  **IT IS FURTHER ORDERED** that Defendants' Motion for Leave to File a Sur-Reply [DN 72] is **GRANTED**.  The Clerk of Court shall file the tendered Sur-Reply attached to Defendants' Motion [DN 72].

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

February 23, 2016

cc:      Counsel of Record